**Marcus GUMZ, Plaintiff-Appellee, Cross-Appellant,**

**v.**

**Douglas MORRISSETTE and Lawrence Cloutier, Defendants-Appellants, Cross-Appellees.**

Nos. 84–3124, 84–3173.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1985.

Decided Sept. 5, 1985.

Rehearing Denied Sept. 27, 1985.

Russell J. Mittelstadt, Eugene R. Thompson, Madison, Wis., for plaintiff-appellee, cross-appellant.

John R. Sweeney, Wisconsin Dept. of Justice, Madison, Wis., for defendants-appellants, cross-appellees.

Before CUMMINGS, Chief Judge, EASTERBROOK, Circuit Judge, and WRIGHT, Senior Circuit Judge.*

CUMMINGS, Chief Judge.

Plaintiff Marcus Gumz filed this civil rights action against eleven defendants, officials and employees of the Wisconsin Department of Natural Resources ("DNR"), alleging numerous violations of the Constitution and liability pursuant to 42 U.S.C. § 1983. The district court entered judgment on a jury verdict finding that defendants had used excessive force in arresting Gumz and denied defendants' post-verdict motions seeking judgment in their favor. The court also refused plaintiff's requests to amend the judgment so that the jury verdict would be read to include liability for the seizure of plaintiff's property and denied his request for recovery of hospital and medical expenses. Both parties appeal the court's post-trial rulings. For the reasons set forth below, the judgment of the district court is affirmed in part and reversed in part.

I

Plaintiff Marcus Gumz at all times relevant to this case was a "muck farmer"

---

* The Honorable Eugene A. Wright, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, is sitting by designation.

living near Baraboo, Wisconsin. Much of the farming in this area requires continuous drainage of the low-lying fields in order to keep the land from reverting to ponds and marshes. The maintenance of drainage systems requires removal of runoff or "muck" from waterways, thus giving rise to the term "muck farmer." Gumz raised mint and other crops on his large tract of land (some 2,700 acres) but was deeply in debt (Plaintiff's App. 104). A drainage ditch known as the leech waterway ran through Gumz' property, and the farmer utilized a "dragline" or a two-ton apparatus consisting of a steam shovel and a fifty-foot boom to scoop muck out of the waterway (Plaintiff's App. 259, 260). The DNR considered the leech waterway a navigable body subject to its regulation and in 1975 commenced a civil action in state court against Gumz for dredging the ditch without a permit in violation of Wis.Stat. § 30.20 (1979).[1] That action ultimately was dismissed on September 18, 1981, after the incident at issue here occurred, because of delay and the fact that the DNR had commenced a similar and more recent action (Plaintiff's App. 212).

On October 28, 1980, Warden Dennis Jameson investigated a complaint of dredging of the leech waterway without a permit and issued a citation to the dragline operator. A dispute exists over Jameson's attempt to issue the citation to Gumz and over a subsequent automobile altercation where both Jameson and Gumz claimed they were run off the road by the other. Rather than serve it personally, Warden Jameson then sent by certified mail a dredging citation to Gumz regarding the October 28, 1980, incident, allegedly at the request of the district attorney (Defendants' App. 377). Gumz apparently refused to accept the citation, thinking it was a bill,

and the letter was returned (Plaintiff's App. 104, 273, 274; Defendants' App. 377). The district attorney's office issued an arrest warrant and complaint (dated February 19, 1981, Defendants' App. 373) against Gumz for failure to answer the October 28, 1980, citation in court. Warden Jameson and defendant Warden Cloutier allegedly were informed of continued dredging on the Gumz property (Defendants' App. 183) and Cloutier decided on March 2 to investigate the dredging and to serve the arrest warrant on the following day (Defendants' App. 235–236, 243, 247).

On March 3, 1981, Wardens Kern and Morrissette allegedly attempted to serve the arrest warrant on Gumz at the University of Wisconsin at Baraboo, but then proceeded to the Gumz property. Wardens Cloutier and Zabel first proceeded by car to the Gumz farm, observed the dredging in progress and ordered six reserve DNR personnel, who had been instructed to wait ten miles away, to stand by one mile from the Gumz property (Defendants' App. 235). Cloutier decided to arrest Gumz and knocked on plaintiff's door but he did not answer (Defendants' App. 235, 243, Plaintiff's Br. 9). Kern and Morrissette then arrived by auto and knocked on Gumz' door to serve the warrant and Gumz again did not answer. Cloutier and Zabel walked 100 yards to the site of the dredging and arrested the operators (Defendants' App. 235). Gumz exited his house, drove to the Kern-Morrissette vehicle and ordered it off his farm. After allegedly being informed of the warrant for his arrest, Gumz returned to his car and backed into the Kern-Morrissette vehicle (Defendants' App. 245). The severity of the collision and the intended destination of Gumz (the dragline site or his house) were subjects of dispute below.

---

**1.** The statute in force at the time relevant to this action provided in pertinent part:

    30.20 Removal of material from beds of navigable waters. (1) Unlawful Removal. (a) No person shall remove any material from the bed of any navigable lake or from the bed of any outlying waters of this state without first obtaining a contract therefor as provided in sub. (2).

    (b) No person shall remove any material from the bed of any lake or stream not mentioned in par. (a) without first obtaining a permit from the department under sub. (2)(c).

    (c) Any person violating this section shall forfeit not more than $1,000 for each such violation.

    \*    \*    \*    \*    \*    \*

Wis.Stat. § 30.20 (1979).

At any rate, after the collision Gumz drove toward his house and at that point defendant Cloutier called the six DNR reserves onto the Gumz property. They entered the property at high speeds and after a brief chase blocked the path of Gumz' auto without contacting plaintiff or his vehicle. The ten DNR personnel were armed with a rifle, pistols, and shotguns. (Plaintiff's App. 286–300.) Gumz then raised his hands in surrender and was arrested without incident and the dragline was seized and removed from the Gumz property (Plaintiff's App. 149–159; Defendants' App. 240–241, 264).

Gumz was taken to the Sauk County Sheriff's office where he was charged by the defendants with violating the dredging law and with a felony of criminal damage to property (Plaintiff's App. 317–318). During his custody Gumz became ill and ultimately he was released after posting a $443 bond (Defendants' App. 319, Plaintiff's App. 318). Almost immediately after his release Gumz was hospitalized for an emergency operation to implant a pacemaker, which he subsequently underwent (Plaintiff's App. 321–327).

Plaintiff filed this action on January 24, 1983, in the United States District Court for the Western District of Wisconsin, seeking $1.425 million in compensatory damages and $1 million in punitive damages. Gumz' complaint charged that the incident of March 3 resulted in violations of the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution and gave rise to liability under 42 U.S.C. §§ 1981, 1982, 1983, 1985(2), 1985(3), 1986 and 1988, and under Wisconsin law. In its Order of August 3, 1984, the district court dismissed all claims, except those arising under § 1983 and under state law, for failure to state a claim on which relief could be granted. The court also ruled that plaintiff's complaint did not adequately allege a violation of the Fourth Amendment so as to state a claim under

§ 1983 since neither the absence of probable cause nor of a neutral and detached magistrate was asserted. This ruling has not been contested. Judge Doyle did hold that valid claims under § 1983 were stated only with respect to the First and Fourteenth Amendments. See pp. 16–17 of opinion of August 3, 1984 (R. Item 26).

The First Amendment claim involved alleged retaliation toward and deterrence of Gumz in the exercise of his rights of expression.[2] Deprivations of plaintiff's liberty and property without due process of law contrary to the Fourteenth Amendment could have resulted, in the court's view, from the use of excessive force in arresting Gumz, from the seizure of the dragline without probable cause to believe it was being used illegally, from holding and interrogating the plaintiff at the sheriff's office for an excessive period of time, and from deliberate and callous indifference to plaintiff's medical needs during his confinement. (8/3/84 Order at 13–18.) Finally, the court ruled that the complaint stated a claim under Wisconsin law for assault and battery, false arrest, false imprisonment, intentional and negligent infliction of mental distress, abuse of process and negligence (8/3/84 Order at 18, 25). The court denied all of defendants' motions for summary judgment. Plaintiff does not appeal any of the adverse rulings in the August 3 Order.

On September 7, three days before trial, the court dismissed plaintiff's state law claims for failure to comply with the Wisconsin notice of claims statute (R. Items Nos. 43 (par. 8), 51 and 53), and this dismissal is not challenged.

At the close of plaintiff's case and at the close of all the evidence defendants moved for a directed verdict on all issues. The court granted the defendants' motions for directed verdict in part, dismissing most of the lower level DNR officials and employees from the case. The court took away from the jury the issues of excessive inter-

---

**2.** Gumz has been involved in public efforts to control the DNR and has frequently spoken out

against the state agency (Br. 20–21).

rogation of plaintiff and of deliberate and callous indifference to plaintiff's medical needs during his confinement. (Defendants' App. 408, 440, 427–428.)

Both sides presented evidence at trial attempting to demonstrate the necessity and reasonableness or the excessiveness and unjustifiability of the degree of force amassed on March 3. The jury returned verdicts in favor of plaintiff and against defendants Morrissette and Cloutier on only one issue, finding that they had caused "the use of excessive force in the arrest of plaintiff on March 3, 1981," and also that Cloutier alone had maliciously caused the use of such force. The jury found that Morrissette and Cloutier had 1) not used excessive force in retaliation for Gumz' opposition to DNR policies and practices nor to deter plaintiff from such expressions in the future, 2) not caused the plaintiff to be confined for an excessive period of time on March 3, 1981, and 3) seized the dragline on March 3 (Cloutier maliciously and Morrissette without a good faith belief that it was constitutional), but had probable cause to believe the apparatus was being used to dredge the leech waterway. Finally the jury found that the use of excessive force caused plaintiff to suffer emotional distress on March 3 and in the immediate aftermath but did not cause him to suffer a heart problem or a persistent change in personality. Compensatory damages of $50,000 and medical expenses of $15,000 were awarded against both defendants and $10,000 in punitive damages was awarded against Cloutier (R. Item 78).

The court entered judgment on the verdict on October 19, 1984, dismissing on the merits all other claims against Cloutier and Morrissette, and dismissing all claims against all other defendants. The state law claims were included in the dismissals. The court denied all post-verdict motions and it is from those denials that the parties specifically appeal.

## II

Although the manner in which the issues of this case ultimately were framed for trial was somewhat unusual, this appeal appears to raise two main questions. First, did the use of force by defendants in executing the March 3, 1981, arrest amount to a constitutional violation, and second, did the seizure of plaintiff's dragline on the same date constitute a deprivation of property without due process of law? We turn first to the excessive force issue.

### A. EXCESSIVE USE OF FORCE

In *Blake v. Katter,* this Court expressly recognized that "an allegation of excessive force during an arrest is cognizable under § 1983." 693 F.2d 677, 682 (7th Cir.1982). The constitutional provision on which most courts, including the district court (8/3/84 Order at 16–17), ground a § 1983 claim solely alleging excessive use of force by state officials is the Fourteenth Amendment. In other words, the use of force is treated as a potential deprivation of liberty without due process of law. *Blake v. Katter,* 693 F.2d at 682; *Black v. Stephens,* 662 F.2d 181, 188 (3d Cir.1981), certiorari denied, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876; *Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, 1352 (9th Cir.1981), affirmed on other grounds *sub nom. Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413; *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir.1981); *Johnson v. Glick,* 481 F.2d 1028, 1032 (2d Cir.1973), certiorari denied *sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324; *Dobson v. Green,* 596 F.Supp. 122, 125, 124 (E.D.Pa.1984); but see *Jenkins v. Averett,* 424 F.2d 1228, 1232 (4th Cir.1970) (Fourth Amendment made applicable to states by Fourteenth Amendment protects persons from injuries arbitrarily inflicted by state officials); [3] *Lykken v. Va-*

---

**3.** Since plaintiff failed below to amend his complaint after his claims based on the Fourth Amendment were dismissed (*supra* p. 1398) and has not raised any Fourth Amendment issue on appeal, we need not consider whether the

March 3 incident involved an unreasonable search or seizure and for purposes of the excessive force issue we must assume that the arrest itself was legal. See *Lieutenant Mary Ogden v. United States,* 758 F.2d 1168, 1175 (7th Cir.

*vreck*, 366 F.Supp. 585, 595 (D.Minn.1973) (excessive force in effecting arrest governed by Fourth Amendment).

The primary inquiry in addressing an excessive force claim brought under § 1983 is whether the conduct of state officials was so egregious or intolerable as to shock the conscience of the court and constitute a constitutional violation as opposed to a mere violation of state tort law. The Supreme Court has made it clear that "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law," *Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433, and that "not every injury in which a state official has played some part is actionable under [§ 1983]." *Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 486. Consequently remedies for violations of duties arising out of tort law must be sought in state court. *Baker*, 443 U.S. at 146, 99 S.Ct. at 2695.

The right protected by the Fourteenth Amendment in the context of claims of excessive force is "the right to be free of state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as to literally shock the conscience of the court." *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.1980). The determination of whether this right has been violated requires a certain amount of line-drawing, and must be resolved on a case-by-case basis. See *Shillingford*, 634 F.2d at 265; *Johnson v. Glick*, 481 F.2d at 1032–1033. Three of our sister Circuits utilize a three-part standard to provide guidance in making this delicate determination and we adopt the test. According to this standard the use of force by a state officer is unconstitutional if it 1) caused severe injuries, 2) was grossly disproportionate to the need for action under the circumstances, and 3) was inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience. See *Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir.1981); *Shillingford*, 634 F.2d at 265 (5th Cir.); *Hall v. Tawney*, 621 F.2d at 613 (4th Cir.).

Application of this standard to the instant case indicates that defendants' conduct did not amount to a constitutional violation. Since there is sufficient evidence to support the jury's finding that Cloutier maliciously caused the use of excessive force, and in view of the fact that the draconian operation of March 3, 1981, was orchestrated to secure payment of a $100 civil penalty and terminate further civil violations, it would not be proper for this Court to reverse the district court's judgment on the basis of either the second or third criterion of the three-part test. A review of the court's holdings and the jury's findings with respect to the injury sustained by Gumz as a result of the March 3 incident, however, forces us to conclude that this case does not involve the type of severe harm redressible under § 1983.

1985); *City of Chicago v. United States Dep't of Labor*, 753 F.2d 606, 607 n. 1 (7th Cir.1985).

If an excessive use of force were viewed as implicating the Fourth Amendment it would appear that the doctrine of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (see *infra* p. 1403) would not present a bar to such a claim, since *Parratt* is inapplicable where the plaintiff asserts a violation of substantive constitutional guarantees as distinguished from procedural due process rights. See *Bell v. City of Milwaukee*, 746 F.2d 1205, 1239 n. 39 (7th Cir. 1984). Although several district courts have recently held that *Parratt* applies to excessive force claims brought under § 1983, see, *e.g.*, *Dobson v. Green*, 596 F.Supp. 122 (E.D.Pa.1984);

*Barnier v. Szentmiklosi*, 565 F.Supp. 869 (E.D. Mich.1983), defendants waived any argument that *Parratt v. Taylor* bars plaintiff's excessive force claim by not raising the issue in the district court. See *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1220 (7th Cir.1984).

The Supreme Court's willingness to address an excessive force claim under the Fourth Amendment in *Tennessee v. Garner*, 471 U.S. ——, 105 S.Ct. 1694, 85 L.Ed.2d 1, clearly indicates the propriety of a Fourth Amendment analysis of such claims. Since no substantive due process claim was before the Court in *Garner*, that decision does not invalidate a Fourteenth Amendment analysis of excessive force claims, and only that Amendment is before us.

The situation before us viewed in its worse light can be summarized as follows: two state officials implemented an operation to enforce a civil statute that utilized too many bodies and too many guns and those officials maliciously planned the needlessly dramatic and coercive operation knowing it would surprise, frighten, upset and anger the plaintiff. The jury found that the harm or injury resulting to Gumz because of the incident was "emotional distress on March 3, 1981 and in the immediate aftermath" (R. Item 78). The jury specifically refused to find that the use of force caused plaintiff to suffer either a "heart problem" or a "persisting change in personality" (*id.*). In his post-trial motions, plaintiff asserted that he should be compensated for hospital and medical expenses incurred shortly after the March 3 incident, but the district judge rejected this contention, explaining:

> The critical point is that the jury found that the defendants' conduct had not caused anything but the immediate emotional distress, and that determination is supported by credible evidence. * * * And there was no basis in the evidence for suggesting that during that short term, which was referred to in the order by the words, "On March 3, 1981 and in the immediate aftermath," * * * that injury to the plaintiff involved the necessity for medical care and hospitalization and various procedures and so on * * *. (11/21/84 Transcript at pp. 68–69).

Neither the court nor the jury found that Gumz was struck, pushed, mistreated or threatened during the incident or suffered even any minor physical injuries as a result of the incident. With respect to the post-arrest period, the district judge ruled as a matter of law that there was no excessive questioning of Gumz and no deliberate or callous indifference to his medical needs (Defendants' App. 426–429). The jury found that there was no excessive period of confinement of Gumz (R. Item 78). Thus the only force involved here was the grossly excessive demonstration of manpower and firepower. The only resulting injury or harm was the understandable emotional distress suffered by the unsuspecting and unwary target of the display. Where the undue force underlying an excessive force claim primarily consists of an abstract demonstration of force and not its actual use, a justified finding of liability under § 1983 would be most unusual.

While this type of unnecessary display of force can hardly be condoned, the restraint shown by these officials in utilizing the force amassed and the absence of any physical or bodily injury place this case with those claims actionable only under state tort law. Plaintiff cites and this Court can discover no case allowing recovery for use of excessive force under § 1983 where there was an absence of any kind of bodily or physical injury resulting from the use of force. Plaintiff argues that *Lykken v. Vavreck*, 366 F.Supp. 585 (D.Minn.1973), allowed recovery under § 1983 under similar circumstances. Although *Lykken* did involve the unnecessary utilization of ten to twenty uniformed policemen to break up a peaceful gathering, the court's holding of liability under § 1983 rested predominantly on the fact that the police raid "was undertaken as a harassment tactic, because of plaintiffs' political beliefs" with a purpose "antithetical to the First Amendment." 366 F.Supp. at 595. In the present case the jury expressly found that the defendants' actions were not taken to retaliate for or deter Gumz' expressions of opposition to DNR policies and practices (R. Item 78). The *Lykken* court also appeared to base § 1983 liability in part on Fourth Amendment considerations to which plaintiff, as noted *supra* note 3, has waived any objections. 366 F.Supp. at 595.

This Court is not holding that some type of bodily injury is an absolute requirement to § 1983 liability based on an excessive force claim. But the ultimate question here is, after all, whether the use of force was so egregious as to be constitutionally excessive, and the presence of some physical injury is certainly relevant to that determination. Circumstances involving actions of state officials maliciously designed to take advantage of a known mental weak-

ness or instability and to evoke an extreme emotional response from an individual could violate Fourteenth Amendment due process guarantees (even if the emotional distress suffered by the individual did not result in any observable physical symptoms). In such a case the "severe injury" required by our three-part standard would be present. Although defendants here must have known that their operation would upset and anger the plaintiff, the facts of this case as determined by the judge and jury do not implicate the type of "brutal and demeaning" attack on the psyche of Marcus Gumz which would be actionable under § 1983.[4]

## B. SEIZURE OF THE DRAGLINE

The district court appeared to rule that the alleged seizure of plaintiff's dragline stated a valid claim under § 1983 on the theory that the seizure potentially constituted a deprivation of property without due process of law in violation of the Fourteenth Amendment (8/3/84 Order pp. 16–17).[5] In framing the issue for trial, the court reasoned that a jury finding of probable cause that the dragline was being used for dredging on March 3 would puncture any contention that the seizure violated due process constraints (id. at 17; R. Item 78; Defendants' App. 433). The plaintiff objected to this approach both below and here by arguing that even if probable cause existed, the seizure added weight to the excessive force claim and formed part of the basis of the jury's award compensating plaintiff for his emotional distress because the seizure was wholly unnecessary and maliciously undertaken (Br. 32–36; Defend-

ants' App. 102–103, 441–442; 11/26/84 Order).

The defendants seemingly suggest that the district court's analysis of the deprivation of property issue is justified by the DNR officials' need to seize the dragline as evidence of the illegal dredging (Reply Br. 12). We fail to understand how this need justifies the seizure without notice or hearing of property used to commit a civil violation. Since the plaintiff raises this point indirectly on appeal (Br. 33–34) and appears to have raised it below (Defendants' App. 441–442), we will not rule that Gumz has waived objection to the district court's error. We nevertheless affirm the district court's refusal to allow Gumz compensation for the seizure under § 1983 since under *Hudson v. Palmer*, 468 U.S. ——, 104 S.Ct. 3194, 82 L.Ed. 393, it is clear that the seizure was not a deprivation of property without due process of law.

Because plaintiff's dredging was not prohibited by a criminal statute, the taking in this case cannot be justified as a seizure of the evidence or instrumentality of a crime. See *United States v. One 1967 Porsche, etc.*, 492 F.2d 893, 895 (9th Cir. 1974). The basis for the arrest of Gumz and seizure of his property, WIS.STAT. § 30.20, see *supra* note 1, is a civil statute prohibiting the removal of "any material from the bed of any lake or stream" and providing that any person violating the statute shall "forfeit not more than $1,000 for each such violation." The relevant enforcement section of the Harbors and Navigation Chapter (in which § 30.20 is located), WIS.STAT. § 30.03 (1979), states that "All forfeitures shall be recovered by civil action as provided in ch. 778."[6] It appears

4. *Duncan v. Nelson*, 466 F.2d 939, 945 (7th Cir. 1972), certiorari denied, 409 U.S. 894, 93 S.Ct. 116, 175, 34 L.Ed.2d 152 which held that "physical violence need [not] be present to produce the coercion necessary to constitute an involuntary confession cognizable under § 1983," is not contrary to our holding today. While the presence or threat of physical violence is indeed of limited relevance to determining whether psychological coercion rendered a confession involuntary, the absence of such violence or of any resulting physical injury is most relevant to the inquiry of whether the use of force by state

officials is so excessive as to shock the conscience of the court.

5. Any claim that the seizure constituted a violation of the Fourth Amendment was waived both in this Court and below. See *supra* note 3.

6. The enforcement section, § 30.03, also provides that where the "public interest may not be adequately served by imposition of penalty or forfeiture," the relevant department may issue an order directing parties to refrain from certain acts, but provides that no penalty may be

that a "forfeiture" of $100 was sought in the Wisconsin Circuit Court (Defendants' App. 385) under § 30.03(3). Thus the seizure here must be analyzed as a taking under the due process clause.

■ The Supreme Court has stated the general rule that "absent an 'extraordinary situation' a party cannot invoke the power of the state to seize a person's property without a *prior* judicial determination that the seizure is justified." *United States v. Eight Thousand Eight Hundred & Fifty Dollars*, 461 U.S. 555, 562 n. 12, 103 S.Ct. 2005, 2011, n. 12, 76 L.Ed.2d 143. A great number of cases have considered whether statutes authorizing seizures of property utilized in violations of civil statutes without a pre-deprivation hearing (or with no hearing at all) involve the necessary extraordinary circumstances. See *United States v. An Article of Device "Theramatic,"* 715 F.2d 1339 (9th Cir.1983), certiorari denied *sub nom. Cloword v. United States*, —— U.S. ——, 104 S.Ct. 1281, 79 L.Ed. 685; *Sutton v. City of Milwaukee*, 672 F.2d 644 (7th Cir.1982); *United States v. Vertol H21C*, 545 F.2d 648 (9th Cir.1976). Deprivation of property in the instant case involves a special kind of taking by the state, expressly considered by the Supreme Court in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, where the loss of property "is occasioned by a random, unauthorized act by a state employee, rather than by an established state procedure." *Hudson*, 468 U.S. at ——, 104 S.Ct. at 3203, 82 L.Ed. at 406. In such circumstances, where the state cannot predict or realistically prevent the deprivation of property, *Parratt* ruled that the Fourteenth Amendment is not violated if the state provides a meaningful post-deprivation remedy. 451 U.S. at 541–43, 101 S.Ct. at 1916–17. Although the rule of *Parratt* was necessarily limited by the facts of that case to negligent deprivations of property, the Supreme Court in *Hudson v. Palmer* extended the holding of *Parratt* to intentional deprivations of prop-

erty. 468 U.S. at ——, 104 S.Ct. at 3203, 82 L.Ed. at 407.

■ There is no dispute that the instant case involved an intentional taking of plaintiff's property. It is also clear that the deprivation was the result of a random and unauthorized act of a state official. Neither WIS.STAT. § 30.20(1)(b) nor WIS.STAT. § 30.03(3) authorized the seizure of Gumz' property. The Wisconsin civil action for recovery of statutory forfeitures, WIS.STAT. § 778 (1979), allows a court to issue an arrest warrant if an alleged violator has failed to appear in court as required by the civil citation. See WIS.STAT. § 778.25(8)(a). The defendants were acting under such a civil arrest warrant issued because of Gumz' failure to answer to the dredging citation (Defendants' App. 373; Defendants' Exhibit 10). See WIS.STAT. § 778.-25(8)(a). Seizure of a civil defendant's property would only be permissible after entry of judgment and issuance of a writ of execution by the court. See WIS.STAT. § 815.02, 815.05. There is no evidence that the proceedings against Gumz had reached this stage. Consequently, our remaining inquiry is solely whether Wisconsin provided the plaintiff with a meaningful post-deprivation remedy to redress the taking of his property. We are satisfied that the remedies are adequate.

Wisconsin law contains a provision which establishes a simple procedure for obtaining the return of property seized with or without a warrant and such property may be withheld only if it is contraband or is needed for evidence. See WIS.STAT. § 968.-20. An action for "the recovery of personal property or the unlawful withholding or conversion of personal property" also exists under Wisconsin law. See WIS.STAT. § 895.01(1); *Preston v. United States*, 696 F.2d 528 (7th Cir.1982); *Production Credit Association v. Nowatzski*, 90 Wis.2d 344, 280 N.W.2d 118 (1979). An action for tres-

imposed for violation of such an order although violation of a judgment enforcing the order may be punished by civil contempt proceedings. WIS.STAT. § 30.03(4)(a), (b). There is no evi-

dence that the DNR was proceeding under the above procedures which, in any event, are civil in nature.

pass to personal property is also available. See *Wisconsin Power & Light Co. v. Columbia County,* 3 Wis.2d 1, 87 N.W.2d 279 (1958). If defendants were acting without authority, as it appears, they would be personally amenable to suit under Wisconsin law since Wisconsin public officers enjoy no immunity when acting in clear absence of all jurisdiction or authority, see, *e.g., Maynard v. Madison,* 101 Wis.2d 273, 304 N.W.2d 163, 167 (1981), or when engaging in malicious, wilful and intentional conduct. See, *.e.g., Yotvat v. Roth,* 95 Wis.2d 357, 290 N.W.2d 524, 530 (1980). But even if defendants were acting "in their official capacity or in the course of their agency or employment," the only prerequisite to an action against them is the service upon the Wisconsin attorney general of written notice of the claim within 120 days of the event causing the injury or damage giving rise to the claim. See Wis.Stat. § 893.-82(1).

Because Wisconsin provides Gumz with adequate post-deprivation remedies for the seizure of his property, no violation of the Fourteenth Amendment occurred in this case.

The district court's judgment is affirmed to the extent it does not allow compensation to the plaintiff for the seizure under § 1983. The judgment is reversed with respect to the excessive force claim with directions to enter judgment for the defendants.[7]

EASTERBROOK, Circuit Judge, concurring.

Chief Judge Cummings has written a thoughtful and comprehensive opinion. I join all of it except Part II.A. With respect to that portion I concur only in the judgment. The difference between our positions is subtle but important. Part II.A analyzes a claim of excessive force in making an arrest as one of substantive due process, which permits decisionmakers to

award damages for conduct that "shocks their consciences." I conclude that such claims should be assessed under the standards of the Fourth Amendment. If an arrest is objectively reasonable within the meaning of the Fourth Amendment, that should be the end of the matter.

The most natural way to think about a claim that officers used excessive force in making an arrest is as an assertion that they violated the commands of the Fourth Amendment, the only part of the Constitution directly addressing seizures of the person by police. To say that police used excessive force is to say that they violated people's "right to be secure in their persons ... against unreasonable ... seizures." The only time the Supreme Court has held that the police used excessive force in making an arrest, it did so under the Fourth Amendment. *Tennessee v. Garner,* — U.S. —, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (deadly force may be used to make an arrest only if the suspect appears dangerous). The Court also has said that officials' compliance with the Fourth Amendment forecloses actions for the deprivation of liberty at the time of an arrest. *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). We have held several times that "a person who is arrested pursuant to a facially valid warrant ... generally has no claim for an unconstitutional deprivation of liberty under section 1983." *Mark v. Furay,* 769 F.2d 1266, 1268 (7th Cir.1985); *Friedman v. Village of Skokie,* 763 F.2d 236, 239 (7th Cir.1985); *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1344 n. 10 (7th Cir.1985); *Terket v. Lund,* 623 F.2d 29, 31 (7th Cir.1980).

The majority properly emphasizes that the majority of appellate courts that have considered claims that excessive force was used to make an arrest have analyzed these claims as deprivations of liberty under the Fourteenth Amendment rather than as unreasonable seizures under the Fourth. But

---

**7.** In view of our holding, we do not address the plaintiff's argument that he is entitled to recover hospital and medical expenses from defendants nor defendants' arguments that the district

court erred in permitting plaintiff to recover punitive damages and in ruling that defendants had waived the defense of qualified immunity.

all of these cases predate *Garner.* One predates *Baker,* where the Court used the Fourth Amendment to analyze the arrest despite Justice Blackmun's invocation, in a concurring opinion, of the "shocks the conscience" test derived from *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). See *Baker, supra,* 443 U.S. at 147, 99 S.Ct. at 2696 (Blackmun, J., concurring).

Although the Fourth Amendment was designed for the sort of claim Gumz presses, the Due Process Clause of the Fourteenth Amendment was not. Gumz does not want notice and an opportunity for a hearing before being subjected to a maliciously frightening arrest. He does not want process of any kind, due or otherwise. He asserts a substantive right to be free from intentional infliction of emotional distress in the course of being arrested. Cases such as *United States v. Price,* 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), and *Jackson v. City of Joliet,* 715 F.2d 1200, 1202, 1204 (7th Cir.1983) (dictum), where the police acted as judge, jury, and executioner, pose a different problem. A claim that the police never made a lawful arrest, or that after arrest the police skipped the trial on the way to the punishment, is within the central meaning of due *process.*

The use of the Due Process Clauses to achieve substantive ends has no support in the language or history of the Constitution. The language speaks of process, not substance. On the history see II Crosskey, *Politics and the Constitution in the History of the United States,* 1102–16 (1953); Corwin, *The Doctrine of Due Process of Law Before the Civil War,* 24 Harv.L.Rev. 366–85, 460–79 (1911); Jurow, *Untimely Thoughts: A Reconsideration of the Origins of Due Process of Law,* 19 Am.J.Legal History 265 (1975). The first time the Supreme Court encountered one of the two due process clauses, it conducted a historical review and concluded that the text was designed only to incorporate some of the basic procedural guarantees of English law. *Murray's Lessee v. Hoboken Land &*

*Improvement Co.,* 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1856). See also *Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884).

Substantive due process made its entrance in Chief Justice Taney's offhand remark in *Scott v. Sandford,* 60 U.S. (19 How.) 393, 450, 15 L.Ed. 691 (1857), hardly an auspicious beginning. A few state courts had hinted at substantive review starting in 1820, see Corwin, *supra.* The hints flowered in 1857. Since then substantive due process has been the foundation of some of the most unsuccessful inventions in constitutional law. In addition to *Dred Scott* itself, see, e.g., *Mugler v. Kansas,* 123 U.S. 623, 661, 8 S.Ct. 273, 297, 31 L.Ed. 205 (1887); *Allgeyer v. Louisiana,* 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897); *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). The Supreme Court regularly buries the doctrine, *Lincoln Federal Labor Union v. Northwestern Iron & Metal Co.,* 335 U.S. 525, 535–37, 69 S.Ct. 251, 256–57, 93 L.Ed. 212 (1949); *North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973), but it just as resolutely refuses to stay dead. See the inconclusive debate in *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), in which four Justices supported the use of substantive due process to vindicate "traditional family values," four Justices denied the validity of the doctrine, and one Justice ducked the issue.

Substantive due process once was used to invalidate legislation affecting prices, wages, and hours, legislation the Court thought struck at the heart of freedom of contract. When enthusiasm for freedom of contract waned, the Court resurrected the same doctrine—with the same lack of textual and historical support—to protect a new constellation of values, this one having to do with family, procreation, and privacy. What unites the many lives of substantive due process is any action "deeply repulsive to the feelings of Supreme Court Justices." *Bigby v. City of Chicago,* 766 F.2d 1053,

1058 (7th Cir.1985). This is the sense in which the doctrine was used in *Rochin,* which declared that the use of a stomach pump to obtain evidence violates the Due Process Clause of the Fourteenth Amendment.

*Rochin* was a transitional case. The majority resorted to substantive due process in *Rochin* because the Court had not yet decided whether the Fourteenth Amendment incorporated the meaning of the Fourth. As the majority saw things, there was no other way to protect the deeply held value of the integrity of one's body. The Court now has held, rightly or wrongly, that the Fourth Amendment applies fully to the states through the Fourteenth. This has transformed the Court's approach to issues of bodily integrity. For example, *Winston v. Lee,* —— U.S. ——, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), applied the reasonableness test of the Fourth Amendment to decide whether officials may put a suspect under general anesthesia and invade his body to extract a bullet that may link him with a crime. See also *United States v. Montoya de Hernandez,* —— U.S. ——, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (Fourth Amendment analysis of a lengthy detention so that officials could examine the contents of a person's excreta); *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (Fourth Amendment analysis of a forcible extraction of blood). In *Winston* the Court relegated *Rochin* to passing mention in a footnote. 105 S.Ct. at 1617 n. 5. In *Montoya de Hernandez* the Court did not cite *Rochin.*

Because substantive due process has always been so dependent on the personal feelings of the Justices; because it has no pedigree other than a trail of defunct, little-mourned, and sometimes (as in *Dred Scott*) pernicious doctrines; and because there is no need to conjure up a constitutional doctrine when there is an Amendment directed to this specific subject, we should not employ substantive due process here. Substantive due process is a shorthand for a judicial privilege to condemn things the judges do not like or cannot understand. The Constitution does not give such power to judges. Whatever the demands of the consciences of the Justices, we ought not instruct randomly selected jurors or the relatively numerous lower federal judiciary to vindicate *their* consciences as well as those of the Justices. The Justices ultimately may instruct lower courts to follow such a path, but *Garner, Winston,* and *Baker* offer little reason to believe they will. It is unnecessary to supply a right of action for conduct in arrests that "shocks the conscience" in order to furnish a reasoned foundation for any line of cases in the Supreme Court; it is not a logical outcome of any line of cases. Until the Supreme Court holds that substantive due process is the right way to think about claims arising out of fright in the course of being arrested, lower courts ought not to make the choice voluntarily. See *Dronenburg v. Zech,* 741 F.2d 1388, 1396–97 (D.C. Cir.), *reh. denied,* 746 F.2d 1579 (1984).

The choice between substantive due process and reasonableness under the Fourth Amendment puts more than nice questions of doctrine at stake. The notorious difficulties in defining reasonableness under the Fourth Amendment are insignificant compared to the randomness that flows from asking people what shocks their consciences. Reasonableness is an open-ended approach, to be sure, but it has roots in tort law. It calls for an objective balancing of the harms from the arrest or search against the potential harms to effective law enforcement of delaying the action or not acting at all. The graver the crime and the more exigent the circumstances, the more police can do—whether that means searching on a lesser probability of finding something, entering a dwelling at night, or tearing a house apart in search of evidence. See *Llaguno v. Mingey,* 763 F.2d 1560, 1564–67 (7th Cir.1985) (en banc). See also Alschuler, *Bright Line Fever and the Fourth Amendment,* 45 U.Pitt.L.Rev. 227, 252–60 (1984).

The Supreme Court, aware of the difficulties in defining what is reasonable, has been trying to codify the concept, replacing

balancing tests with rules whenever possible. Compare *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), and *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), with *Illinois v. Gates*, 462 U.S. 213, 230–41, 103 S.Ct. 2317, 2328–34, 76 L.Ed.2d 527 (1983). See also LaFave, *"Case-by-Case Adjudication" Versus "Standardized Procedures": The* Robinson *Dilemma*, 1974 Sup.Ct.Rev. 127. There is now a tremendous body of precedent dealing with searches and seizures, and these cases furnish rules that ought to be sufficient guidance in a case such as this. Yet a "shocks the conscience" test spurns bright lines. It spurns rules. It is a vague standard—if it can be called a "standard" at all—inviting decisionmakers to consult their sensibilities rather than objective circumstances. Sensibilities vary from person to person and place to place; an officer told to do nothing that "shocks the consciences" of six people to be drawn out of a jury wheel some years hence would have considerable difficulty knowing how to behave.

The most significant difference between substantive due process and reasonableness under the Fourth Amendment is that one requires scrutiny of motive and the other forbids it. The third part of the standard the majority adopts in Part II.A is whether the official action "was inspired by malice." The plaintiff puts the officials' motives in issue and invites the jury to be "shocked" by malice or any other evidence that the police wanted to "get" the plaintiff. That is what this trial was all about. The bulk of the evidence was devoted to showing that the defendants had a long-running dispute with Gumz and set up his arrest in order to annoy, aggravate, frighten, and humiliate him. This was the basis of the award of punitive damages against Cloutier.

The Fourth Amendment, in contrast, calls for objective inquiry only. The officer's pure heart provides no defense if his conduct was unreasonable in light of the facts he knew or should have known; the officer's evil design does not invalidate his acts if the facts otherwise support his deeds. *Scott v. United States*, 436 U.S. 128, 135–39, 98 S.Ct 1717, 1722–24, 56 L.Ed.2d 168 (1978). Our circuit has held consistently that a person "cannot claim that his arrest violated his constitutional rights merely because the defendants had malicious motives for arresting him." *Mark v. Furay, supra*, 769 F.2d at 1268 (collecting cases). Motive counts in the sense that "bad faith" efforts to obtain a warrant (as by misrepresenting facts), or "bad faith" efforts to execute a warrant (as by exceeding its scope), may invalidate an arrest, but in such cases "bad faith" is simply a label attached to objectively unreasonable conduct (such as lying to the magistrate to obtain the warrant). See, e.g., *Olson v. Tyler*, 771 F.2d 277 (7th Cir.1985).

The Supreme Court's effort to reduce the uncertainty police face under the reasonableness standard of the Fourth Amendment depends on treating the inquiry as objective. Only an objective approach can sustain bright line rules of conduct. The Court also has driven subjective inquiries from the law of "good faith" or qualified immunity for conduct by the police. An officer whose acts do not violate "clearly established" law is immune no matter his motive. *Mitchell v. Forsyth*, —— U.S. ——, 105 S.Ct. 2806, 2818–20, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800, 815–19, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396 (1982). The Supreme Court altered the standard of qualified immunity in *Harlow* precisely to get rid of any inquiry into motive, an inquiry that had bedeviled and prolonged litigation without serving any substantial purpose. The Court concluded that subjective inquiries should be eliminated because there "often is no clear end to the relevant evidence" (457 U.S. at 817, 102 S.Ct. at 2737) and because, among many other things, they make summary judgment all but impossible (*id.* at 816, 102 S.Ct. at 2737). Yet subjective inquiries are an essential part of the approach to sub-

stantive due process the majority adopts today.

The analysis of this case under the Fourth Amendment is straightforward. The wardens had a warrant for Gumz's arrest. They knew Gumz to be irascible and uncooperative; he had refused to accept a citation by hand or by mail. (Whether they also reasonably thought Gumz armed and dangerous was a subject of dispute that the jury evidently resolved adversely to the defendants.) Although Cloutier and Morrissette assembled a team of officers, they initially sent only two onto Gumz's farm. These two knocked peaceably on Gumz's door during working hours, and he refused to answer or come out. At this point they would have been authorized by the warrant to break open the door and take Gumz by force; they elected instead to wait him out. Two additional wardens then appeared to deal with the dragline and its operator. Not until Gumz scrambled into his car and sped down the road, only to collide with other officers and career back toward the house, did the remaining six officers materialize around the house. There they arrested Gumz without a scuffle. There was no unduly offensive touching. Perhaps all of this could have been done with two officers, but the Fourth Amendment does not require the police to use the minimum number of officers to make an arrest. Putting all questions of motive aside, as the Fourth Amendment requires, I conclude that no juror could have found this measured increase in the number of wardens—with no use of force—to be unreasonable.

The majority correctly observes that the district court resolved against Gumz all issues he raised under the Fourth Amendment. Of course, an appellate court may affirm a judgment on any ground properly preserved at trial. *Massachusetts Mutual Life Insurance Co. v. Ludwig*, 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976). My analysis of the Fourth Amendment issue is necessary to determine whether Gumz's judgment should be affirmed on this alternate ground. But if, as the majority concludes, no Fourth Amendment issue

properly is before us, then the correct disposition of the case is to reject the claim of substantive due process as legally unsound and reverse for that reason. We ought not to adopt substantive due process as the law of this circuit for claims of excessive force just because the parties have addressed this case exclusively in those terms.

If the argument I have made is incorrect, however, and this case properly should be analyzed under the Due Process Clause, it is necessary to confront some additional issues. One is the identification of a "liberty" interest. Freedom of movement is a part of every person's natural liberty, *McKinney v. George*, 726 F.2d 1183, 1189 (7th Cir.1984), and being arrested deprives a person of that liberty for the duration. Serious physical injuries in the course of an arrest deprive a person of liberty (and maybe, as in *Garner*, of life) in addition to the deprivation incident to an ordinary arrest. See *Davis v. Forrest*, 768 F.2d 257, 258 (8th Cir.1985) (a battery must be "brutal and demeaning" to state a claim of deprivation of liberty); *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir.1981) (a physical injury in the course of an arrest is not a deprivation of liberty unless the injury is "severe"). But Gumz is not (any longer) challenging the fact of his arrest. He was arrested under a warrant we must assume to be valid. He was not physically injured in the course of the arrest. Although he was technically assaulted when the officers put Gumz in apprehension of an imminent offensive touching, this was a privileged assault because the officers were entitled to touch Gumz and take him away. The interest that concerns us now is not freedom of movement but freedom from gratuitous fright or shock. This is not a liberty interest.

An interest in being free from malicious or gratuitous fright or shock is not part of the freedoms recognized in English law in 1791. It is a recent development. It is very similar to the tort of intentional infliction of emotional distress. "Not until comparatively recent decades has the infliction of mental distress served as the basis of an

action, apart from any other tort." Prosser & Keeton, *Torts* § 12 at 55 (5th ed. 1984). The Constitution does not follow the latest developments in tort law. *Baker v. McCollan, supra; Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). "Liberty" comprises a smaller, more traditional assortment of interests. In *Paul* the Court held that a person lacks a liberty interest in his reputation, although libels may shock and frighten as well as sully one's reputation, and although defamation was a tort recognized in 1791. The plaintiff in *Paul* could not have prevailed by recharacterizing his libel action as one for intentional infliction of mental distress. What the wardens did to Gumz may have been tortious under state law, but they did not deprive Gumz of liberty within the meaning of the Fourteenth Amendment.

If fright deprived Gumz of liberty, it still does not follow that he may bring suit under § 1983 to recover. A state deprives someone of liberty without due process only when it permits its officials to act without either prior, or effective subsequent, remedies. If a state offers its residents effective remedies for random and unauthorized wrongs done them, those remedies are the due process of which the Constitution speaks. *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Gumz does not challenge established state procedures within the meaning of *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). He contends that the officers' acts were unauthorized under state as well as federal law.

The majority concludes, *ante* at 1399 n. 3, that *Parratt* does not apply to claims of "substantive constitutional guarantees as distinguished from procedural due process rights." This is an accurate statement of the law in this circuit. But I believe that *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* —— U.S. ——, 105 S.Ct. 3108, 3121–22 & n. 14, 81 L.Ed.2d 126 (1985), and *Hudson v. Palmer,* —— U.S. ——, 104 S.Ct. 3194, 3202–04, 82 L.Ed.2d 393 (1984), should persuade us to rethink our cases. *Williamson* applied *Parratt* to the deprivation of a substantive right—the right not to have one's property taken for public use without just compensation. A state may take property without any process; it just must pay for what it takes. The Court analyzed a takings claim under *Parratt* by concluding that the deprivation is not complete until the state fails to pay for what it has taken. In *Hudson* the claim was that prison officials intentionally destroyed property a prisoner was allowed to keep in his cell. See also *Ingraham v. Wright,* 430 U.S. 651, 674–82, 97 S.Ct. 1401, 1414–18, 51 L.Ed.2d 711 (1977), which holds that remedies under tort law are due process for the harms inflicted by excessive or unjustified paddling of a child by a teacher. Both *Hudson* and *Ingraham* were presented to the Court as claims to prior hearings, and so they are not formally inconsistent with the analysis in this court's cases. But the line between process and substance in those cases was almost too fine to perceive, and in *Williamson* that line disappeared. *Parratt* therefore should be applied to a claim of the unauthorized use of excessive force in making an arrest.

In fine, it does not matter to the outcome in this case whether the court uses the Fourth Amendment or substantive due process to analyze Gumz's claims. The officers' conduct was objectively reasonable under the Fourth Amendment. The majority rejects the substantive due process claim on the facts; I would reject such a claim for want of a liberty interest and because the state supplies the appropriate remedy. Today's selection of a method of analysis may control the outcome in future cases, however, and tomorrow's cases should be assessed exclusively under the standards of the Fourth Amendment.