**Michele TITRAN, Plaintiff–Appellant,**

v.

**Elesebeath ACKMAN, et al.,
Defendants–Appellees.**

**No. 89–1160.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 8, 1989.

Decided Jan. 11, 1990.

Peter K. Woody (argued), Michael H. Vonnahmen, Springfield, Ill., for plaintiff-appellant.

Karen L. Kendall, Heyl, Royster, Voelker & Allen, Peoria, Ill., Patrick J. Londrigan (argued), Heyl, Royster, Voelker & Allen, Gary S. Rapaport (argued), James K. Zerkle, Feldman & Wasser, Springfield, Ill., for defendants-appellees.

Before POSNER and EASTERBROOK, Circuit Judges, and DUMBAULD, Senior District Judge.*

EASTERBROOK, Circuit Judge.

Michele Titran has two liquor problems. One she shares with many other people is drinking to excess. The second, less common, is that she repeatedly drinks in public although she is a minor and is not entitled to buy (or receive) alcoholic beverages. The police have picked up Titran many times. On March 25, 1987, officer Barbara Klemm found Titran imbibing at Baur's Opera House, a bar in Springfield, Illinois. Klemm arrested Titran, who was 19 at the time. Other police booked Titran at the Sangamon County Jail for both illegal consumption of alcohol (a misdemeanor) and obstructing justice (a felony). She was familiar with the procedure, having been booked before. Officers asked her to dress in an orange jumpsuit, which designates those being held on felony charges. Titran refused—whether because she wanted the blue jumpsuit used for misdemeanor prisoners or because she was just being ornery the record does not tell us.

Police at the lockup, with Klemm's aid, took off Titran's clothing and stuffed her into an orange jumpsuit. Titran says that

* Hon. Edward Dumbauld, of the Western District    of Pennsylvania, sitting by designation.

the officers wrestled her to the ground and broke her wrist, and that they also disabled her with a device that delivers a high-voltage shock (an XR 5000 "cattle prod") and temporarily prevents physical coordination; she says that this bruised her body and her ego. The officers say that Titran injured herself while in her cell, that her wrist was sprained rather than broken, and that the use of force was reasonable in relation to her conduct. Titran concedes that she did not attempt rational conversation:

Q. Did you discuss this with anyone in the C block?

A. No, I was screaming.

Q. What were you screaming?

A. I was screaming in pain. I was screaming in agony. I was, I was screaming that I didn't belong there, and that they didn't have a right to have me there. I was screaming.

Whether Titran was doing more is disputed. All four officers say that she was flailing, kicking, scratching, and biting. Titran's testimony during her deposition gives a different picture:

Q. Did you resist any of the police officers when they attempted to process you at the Sangamon County jail?

A. When they attempted to change me into a felony uniform, I protected myself, which was a fruitless attempt, because there were four of them. I didn't do damage to anyone, no.

Q. When you say when they attempted to put you in a felony uniform, did you become combative?

A. Sir, I was scared to death.

Q. Did you strike anyone?

A. No, sir, I don't believe in physical violence.

Defendants moved for summary judgment, arguing that their conduct was reasonable under the due process standard of *Gumz v. Morrissette*, 772 F.2d 1395 (7th Cir.1985). They also argued that if Fourth rather than Fifth Amendment standards apply, Titran did not establish the mental element they deemed necessary in a Fourth Amendment case, and that they are entitled to qualified immunity. Titran replied that the Fourth Amendment approach should apply because the scuffle occurred before the cell door slammed shut and therefore was part of the process of arrest, and that the reasonableness of the officers' conduct under the Fourth Amendment is a triable issue.

■■■] The district judge agreed with Titran that the Fourth Amendment applies, see *Graham v. Connor*, — U.S. —, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Lester v. City of Chicago*, 830 F.2d 706 (7th Cir. 1987). This Amendment poses the question "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 109 S.Ct. at 1872. Although the conclusion that the Fourth Amendment applies, and that its standard is objective, logically disposed of the questions presented by the parties—for the right to be free of excessive force during an arrest has long been established, making immunity unavailable if the officers indeed applied too much—the court nonetheless granted summary judgment for the defendants. It explained (citation and footnote omitted):

[Titran] ... was admittedly combative and uncooperative. Furthermore, the depositions and supporting documents submitted by Defendants establish that [Titran] was screaming, kicking, scratching, swinging at, and attempting to bite Defendants as they attempted to place Plaintiff in the jail uniform. The use of force sufficient to sprain [Titran's] wrist and the use of an electric shocking device were not unreasonable given the totality of the circumstances. Were conduct such as [Titran's] to go unchecked, an incident such as this could escalate into an altercation where several of the Defendants, as well as Plaintiff herself, could have been seriously injured. Defendants' use of force in the case at bar was an objectively reasonable response to the situation.

This disposition depends on adopting defendants' view of both the provocation (that Titran was kicking, scratching, and biting) and the consequence (that Titran sprained her wrist) over Titran's contrary conten-

tions (that she was screaming but not kicking, and that she suffered injuries in addition to the damage to her wrist). Courts may not resolve disputed questions of material fact in order to grant summary judgment. The district judge took defendants' version of events; Rule 56 requires the court to take the facts and reasonable inferences in the light favorable to the party opposing the motion.

If the dispute were not material, the tilt in defendants' favor would not matter. Klemm, alone among the defendants, argues that the court should not have used the Fourth Amendment's objective reasonableness approach. After *Graham,* 109 S.Ct. at 1871 n. 10; *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Bell v. Wolfish,* 441 U.S. 520, 535–39, 99 S.Ct. 1861, 1871–74, 60 L.Ed.2d 447 (1979); and *Wilkins v. May,* 872 F.2d 190 (7th Cir.1989), three different parts of the Bill of Rights apply in sequence during arrest and confinement. Force during arrest must be reasonable within the meaning of the Fourth Amendment; between arrest and conviction the government may not "punish" the suspect without due process of law; after conviction the government may not inflict cruel and unusual punishment. Klemm submits that Titran had moved from arrest (governed by the Fourth Amendment) to pretrial detention (governed by the Fifth), and that unless force during pretrial detention not only "shocks the conscience" but also inflicts "severe injury"—two elements that appear in *Gumz*—the officials may not be held to account.

We may assume that although Titran had not been placed in a cell by the time of the events in question, her presence in the jail and the completion of the booking marked the line between "arrest" and "detention". It does not follow that officers acquired greater ability to assault and batter Titran. *Gumz* defines elements of "substantive due process", and our circuit

has been chipping away at that case since the date it was decided by a divided panel. *Lester* overruled *Gumz* for the most part (a decision subsequently confirmed by *Graham* ). Although *Lester* held open the possibility that due process principles would apply during detention, 830 F.2d at 713 n. 7, a position *Wilkins* adopted, we have not reaffirmed the propositions of *Gumz,* 772 F.2d at 1400, that only conduct "grossly disproportionate" to the provocation, that "shocks the conscience", and yields "severe injuries" violate the Due Process Clause. To the contrary, *Williams v. Boles,* 841 F.2d 181 (7th Cir.1988), eliminated the "severe injury" element of *Gumz,* observing that a "state is not free to inflict ... pains without cause just so long as it is careful to leave no marks". 841 F.2d at 183.**

*Bell v. Wolfish* held, and *Graham* reiterated, that during pretrial detention the state may not "punish" the suspect. Did the state punish?—and not more ambulatory inquiries into the consciences of jurors or the severity of injury—is the right question when a captive of the state claims that she has been attacked by her jailers. Most of the time the propriety of using force on a person in custody pending trial will track the Fourth Amendment: the court must ask whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. Multiple standards of official conduct send confusing signals that undermine the force of the law; they also complicate litigation. Given *Daniels v. Williams,* 474 U.S. 327, 334, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986), and *Archie v. City of Racine,* 847 F.2d 1211, 1218–20 (7th Cir.1988) (en banc), holding that the Due Process Clause does not proscribe negligence or even gross negligence, the search for "punishment" cannot be wholly objective. Subtle differences between Fourth and Fifth Amendment standards are inevitable on account of this mental element. Still, *Bell v. Wolfish* did not instruct the inferior federal courts to in-

---

** Dividing nine to seven, the Fifth Circuit held in *Johnson v. Morel,* 876 F.2d 477 (1989) (en banc), that "significant injury" is an element of the plaintiff's case after *Graham,* even when the claim involves excessive force at the time of the arrest. *Johnson* did not appear to be aware of *Williams.* After reconsidering the question we remain of the view expressed in *Williams* and respectfully disagree with our colleagues in the Fifth Circuit.

quire into the state of anyone's conscience, and to the extent "substantive due process" applies, it is "at best redundant of [sic] that provided by the Eighth Amendment." *Graham*, 109 S.Ct. at 1871 n. 10; see also *Williams*, 841 F.2d at 183. *Gumz* has been whittled down to nothing by cases in this court and a superior one; it must be regarded as without continuing force. If the officers intentionally restrained, jolted, and roughed up Titran without physical provocation from her, their behavior was unreasonable.

Perhaps, however, the district judge has been mouse-trapped. Titran emphasizes on appeal her denial that she struck the officers. Her lawyer did not draw this portion of the deposition to the district judge's attention, and perhaps the judge believed that defendants' version of events was uncontradicted. Titran's memorandum in opposition to the motion for summary judgment does not contain so much as a statement of facts. Page 3 of the memorandum states: "Though there may be some difference in the facts as stated by the Defendant, Klemm, the basic facts are as set forth in the brief of Defendant. The Court should rule before trial whether [Titran] was a pretrial detainee, thereby not subject to making a Fourth Amendment claim, or an arrestee." A judge reading the first sentence in this jumble might conclude that Titran was accepting Klemm's version of events. The next sentence suggests, though, that Titran accepted Klemm's version only for the purpose of deciding whether affairs had moved past the "arrest"—a subject on which the facts are indeed undisputed. Defendants' motion for summary judgment did not contend that if an objective unreasonableness standard applied, there are *still* no material disputes; the premise of the motion was that only if the court applied the *Gumz* approach (or inserted a mental element into the Fourth Amendment) would summary judgment be appropriate. Titran did not need to point out that the facts pertinent on an objective reasonableness approach are in dispute, for she had no reason to suspect that the court would apply the Fourth Amendment then and there. When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised on pain of forfeiting their position. *Mathotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.1989).

REVERSED AND REMANDED.