**Paul de LA PAZ, Plaintiff,**

v.

**Joseph DANZL, et al., Defendants.**

**No. 85 C 1917.**

United States District Court,
N.D. Illinois, E.D.

Oct. 22, 1986.

Milton Blum, Chicago, Ill., for plaintiff.

Robert W. Fioretti, Sharon A. Zogas, Corporation Counsel, James D. Egan, Asst. State's Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

On March 6, 1985 Paul de La Paz ("de La Paz") filed a pro se 42 U.S.C. § 1983 ("Section 1983") complaint [1] against:

1. Chicago Police Department detectives Joseph Danzl ("Danzl") and Michael Baker ("Baker") for allegedly beating de La Paz during an April 29, 1984 arrest (the "excessive force claim"); and

2. Cermak Health Services ("Cermak") physicians Dr. Joe Shaker ("Dr. Shaker"), Dr. Khrusheed Mallik ("Dr. Mallik") and Dr. Ross Romaine ("Dr. Romaine"), Cook County Hospital physician Dr. Finestine, Cook County Jail paramedic Victor Edwards ("Edwards") and Cook County Department of Corrections Executive Director Phillip T. Hardiman ("Hardiman") for allegedly denying de La Paz adequate medical care while he was incarcerated in the Cook County Jail from May 2, 1984 until November 15, 1985 (the "medical care claim").

De La Paz has since confirmed his desire to drop Dr. Mallik, Dr. Shaker and Edwards as defendants, and this Court so orders.[2]

---

1. Milton Blum, Esq. has since been appointed to represent de La Paz, and he prepared the briefs in opposition to the current summary judgment motions.

2. De La Paz tendered a pro se "Motion for Leave To File an Amended Complaint" in the midst of the briefing process (indeed, just one day before his appointed counsel filed responsive documents to defendants' summary judgment motion on the excessive force claim). But that Motion for Leave To File was simply filed in the Clerk's Office and never brought to this Court's attention (either by de La Paz or his appointed counsel) until appointed counsel's Medical Statement of Facts ¶ 3 referred to it (though mistakenly naming only Dr. Mallik and Edwards and omitting Dr. Shaker) and said "Counsel concurs in such actions." This Court grants de La Paz's request to "drop my charges on these three men." Under the circumstances of the pending motions, this Court has not reviewed the proposed Amended Complaint (after all, Rule 56(e) makes it plain that mere *plead-*

All other defendants except Dr. Finestine[3] have moved for summary judgment under Fed.R.Civ.P. ("Rule") 56.[4] For the reasons stated in this memorandum opinion and order, defendants' motions are granted.

### Facts [5]

At approximately 9 p.m. April 29, 1984 Danzl, Baker and three members of the Chicago Police Tactical Unit Team arrested de La Paz in the home of a friend (CC Mem. 2–3; Arrest Aff. 1). De La Paz Complaint ¶ 1 said that although he did not resist arrest[6] he was beaten:

> I was handcuffed behind back [sic] and systematically beaten in the face, head and body by Det. Danzel [sic] and Det. Baker and they kicked me in the face, head, chest, back and legs. The kicks to my left leg was [sic] so severe that my leg brace (I wear a brace as a result of having a left dropped foot) was kicked apart like a matchstick. My back where they stomped on it, was seriously injured as I have a bullet lodged in my spine and I sustained injuries to the head and face. My wrist were [sic] deeply cut, swollen and bruised from the handcuffs. My

kidney was removed in 1978 and the blows to my body damaged the kidney I have left.

But when it came to making a sworn response to the Rule 56 motion, de La Paz offered a substantially different version:

> 1. Significantly, he now omits any mention of any beating or kicks to the face, describing only blows to his back and waist area and kicks to his legs (Arrest Aff. 1).

> 2. Now he says the kicks to his legs caused only a "crack" in the leg brace (*id.* at 2).[7]

Large close-up Polaroid photographs of de La Paz's upper body (face and neck) taken at the police station just two hours after his arrest show no signs at all of physical injury (CC Mem. Exs. A and B)—his face is unmarked and unswollen. And the same is true of photographs taken the next day in a lineup (*id.* Exs. C and D).[8] Medical examination of de La Paz less than 72 hours after the alleged beating disclosed a "slight [sic] bruised" left wrist, "superficial bruise mid-dorsal, no swelling" and "no bruised [sic]" lumbosacral spine (*id.* Ex. G).

---

*ings* are without force in the face of a properly supported summary judgment motion). If de La Paz had any additional facts that would have posed genuine issues of material fact—thus precluding summary judgment—he had only to submit them in affidavit form; and had a complaint amendment been approved for filing, Rule 56(e) teaches he could not have stood on its allegations in any event. Accordingly leave to file the proposed Amended Complaint is denied.

**3.** Dr Finestine was never served with process and has not appeared in the case.

**4.** Two separate summary judgment motions have been filed: one by Danzl and Baker, represented by the City of Chicago's Corporation Counsel (whose motion and supporting memoranda are referred to as "CC Motion" and "CC Mem."), the other by Drs. Mallik and Shaker (no longer defendants), Dr. Romaine and Hardiman, represented by the State's Attorney of Cook County (whose motion and supporting memoranda are referred to as "SA Motion" and "SA Mem."). De La Paz has filed an answer, statement of facts, memorandum and an affidavit (his own) in opposition to each of those motions. References to those documents will be preceded by either "Arrest" (if in response to

the CC Motion) or "Medical" (if in response to the SA Motion).

**5.** Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). For that purpose this Court must view the evidence in the light most favorable to the nonmovant—in this case de La Paz (*Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)).

**6.** Affidavits of the arresting officers (Baker at 3, Danzl at 3, Butler at 3, Rodriguez at 3) all say de La Paz tried to resist arrest by kicking, shoving and pulling away and that he was subdued with minimal force.

**7.** Arrest Statement of Facts ¶ 4 notes the brace was "seriously damaged" but says de La Paz was "still able to wear it and derive some support."

**8.** All the photographs were filed with this Court *after* de La Paz had filed his clearly unsustainable Complaint allegations and *before* he filed his affidavit (which was thus prepared with knowledge of what the photographs showed—or failed to show).

De La Paz's account of events at the police station following his arrest has also undergone some transformation. Complaint ¶ 1 said Danzl and Baker gave de La Paz a "narcotic drug" to keep him quiet, and he was handcuffed to a wall and not allowed to use the bathroom or washing facilities from April 29 until May 1. But de La Paz's Arrest Aff. 2 says he remained in a room in the police station after his arrest, "leaving only to go to a washroom until the following night when I appeared in aline-up [sic]." Chicago Police Officer Charles Grunhard ("Grunhard") Aff. 2 says he escorted de La Paz to the men's washroom at 2:30 a.m. April 30—de La Paz was then "alert and fully coherent" and did not appear to be under the influence of a narcotic.

On May 1, 1984 de La Paz was admitted to the Cook County Jail (the "Jail") and told someone there his medical problems: a bullet lodged in his spine, the prior loss of one kidney and a dropped left foot (Complaint ¶ 1). De La Paz says (*id.*) he explained his need for a particular medicine, "mendelimine," to prevent urinary infections but was refused "any medical treatment for my kidney" for three weeks and began "abnormally heavy and frequent urination." Yet de La Paz's later Medical Aff. ¶ 1 acknowledges Dr. Mallik prescribed a medication called "bactrium" to ward off infection after de La Paz had been in the Jail for two weeks.

De La Paz Complaint ¶ 9 said as of that date he had not received a proper medical examination, treatment for his kidney disease or the bullet lodged in his spine, or a new leg brace and physical therapy. As a result Complaint ¶¶ 3 and 8 alleged the following injuries:

Since the denial of my medicine in May 1984 by jail officials I've begin [sic] to have fever, headaches, soreness to my one kidney, stomach and can't sleep [sic]. When I do sleep, I sweat so profusely the wetness wakes me up and I'm cold with [sic] my eyes burning.

\* \* \* \* \* \*

Defendants Shaker, Romaine, Finestine and Malleck [sic] each at one time or another refused me medical treatment even though I am sick. My physical condition had [sic] become much worse due [to] their individual actions and non-action.[9]

However, medical records (SA Mem. Ex. A and Dr. Raba Aff. ¶ 6) show de La Paz was treated at Cermak (the facility that provides medical care for Jail inmates) on the very day he entered the Jail (May 2, 1984) as well as on May 18, May 21, May 23, May 30, May 31—and 54 other times up until he left the Jail in November 1985. Medication was prescribed when necessary (SA Mem. Ex. A and Dr. Mallick Aff. ¶ 7). Twice de La Paz was hospitalized at Cook County Hospital (August 30 to September 6, 1984 and December 20–23, 1984), the first time with an infection known as "pseudomonis" (Dr. Raba Aff. ¶ 6(C); Medical Aff. ¶ 1).[10]

When de La Paz filed his Complaint, a leg brace and physical therapy had been ordered for him (Complaint Response to Question 7(C)(2)). Sometime later he received the new leg brace (Medical Aff. ¶ 2 and SA Mem. Ex. A), though neither side has indicated whether de La Paz was ever given physical therapy too. Beginning March 31, 1985 a medical log has been kept to document all ancillary medical services provided de La Paz. It shows he has re-

9. [Footnote by this Court] De La Paz's Medical Aff. ¶ 1 describes other symptoms that allegedly began after Dr. Mallick prescribed bactrium: "frequent and heavy urination" and an inability to "completely evacuate my bladder." In addition, de La Paz says (*id.* at 2) he did not begin to receive catheters until after he filed his Section 1983 claim, and that on one occasion Dr. Romaine denied him treatment, despite a state court order to send him to the University of

Illinois Hospital, because the doctor did not believe anything was wrong with de La Paz (he had just been released from Cook County Hospital).

10. Complaint ¶ 4 says de La Paz contracted that infection "outside of jail" by not taking mendelimine and has been hospitalized three times as a result.

ceived 1,160 trays and catheters for self-catheterization (Pernitz Aff. ¶ 10). De La Paz's Medical Aff. ¶ 2 says he is "still being treated at Pontiac Penitentiary."

### Excessive Force Claim [11]

Though de La Paz does not specify the constitutional basis for his Section 1983 claim, the excessive use of force during an arrest is most frequently classified as a deprivation of liberty without due process of law in violation of the Fourteenth Amendment. *Gumz v. Morrissette*, 772 F.2d 1395, 1399 (7th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1644, 90 L.Ed.2d 189 (1986).[12] In any case, CC Mem. 7 and 9 urge two grounds for summary judgment:

　　1. Res judicata and collateral estoppel doctrines bar the excessive force claim.

　　2. No evidence supports that claim.

This opinion will treat with each argument in turn.

### Issue Preclusion ("Collateral Estoppel") [13]

■ On July 2, 1984 a hearing (the "Hearing") was conducted in state court to determine whether to suppress de La Paz's statement about the location of his car, made to police during his arrest. *State v. de La Paz*, No. 84–5164 (Cook County Circuit Court). During the Hearing de La Paz argued his statement should be suppressed because (1) he was not advised of his Miranda rights before providing the information and (2) he made the statement involun-

tarily as a result of physical coercion (CC Mem. Ex. I at 6). Judge Gillis granted the motion on the first ground but denied it on the second, stating (*id.* at 9–10):

> I see no evidence that the Defendant's answer to that question stemmed from or flowed from or in any way was coerced by the police action in using force to arrest the Defendant. The fact that the two things went on at once I don't think is what should be looked at in evaluating whether a statement should be suppressed. It would only be if the Defendant testified or if there was some evidence that because of pain of the first bodily force or second, or for fear of a second use of force that the statement was made to avoid other pain or other force, that the statement would be said to have eminated [sic] from the force by the police.
>
> Here, it seems to me it all happened at once and I further find that the physical force was reasonable [sic] calculated only to effect the arrest and could not in any way have deemed [sic] any statement involuntary.

CC Mem. 8 asserts that decision by Judge Gillis precludes de La Paz from asserting excessive force in this Section 1983 suit. Not so. Although there is no question the common-law doctrine of issue preclusion applies in Section 1983 suits (*Allen v. McCurry*, 449 U.S. 90, 96–105, 101 S.Ct. 411, 415–420, 66 L.Ed.2d 308 (1980)), the

---

**11.** De La Paz's assertion as to his having been drugged after being taken to the police station is no longer advanced as a predicate for his Section 1983 claim. CC Mem. 10–11 argued that allegation did not state a claim under the Fourteenth Amendment because no injury was alleged and there was no evidence to support the claim. Arrest Mem. did not respond to either argument, limiting itself to the excessive force claim; but its final paragraph (Arrest Mem. 4) did suggest detention practices over an extended period of time without a probable cause hearing would violate the Fourth Amendment. CC R. Mem. 2 n. 1 correctly retorts de La Paz may not raise that argument for the first time in his response to the summary judgment motion.

**12.** Alternatively, an excessive force claim might be characterized as an unreasonable seizure, hence a violation of the Fourth Amendment

(made applicable to states by the Fourteenth Amendment). *Gumz,* 772 F.2d at 1399–1400 n. 3, citing *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985).

**13.** CC Mem. 7 juxtaposes and thereby confuses the two distinct doctrines of issue preclusion and claim preclusion (indeed, one of the reasons for the growing use of those terms is the tendency toward confusion fostered by the courts' occasional use of "res judicata" in an imprecise way, as embracing both concepts). Only issue preclusion could apply in this case, where the parties are litigating a different claim or cause of action from that adjudicated in the state court. See *Jones v. City of Alton, Illinois,* 757 F.2d 878, 884–85 (7th Cir.1985) for a discussion of the distinction between the two doctrines.

inquiry does not end there. It is also necessary to satisfy each of the now well-established requirements for issue preclusion, set out in *County of Cook v. Midcon Corp.*, 773 F.2d 892, 898 (7th Cir.1985):

> In general, collateral estoppel precludes relitigation of issues in a subsequent proceeding when (1) the party against whom the estoppel is asserted was a party to the prior adjudication, (2) the issues which form the basis of the estoppel were actually litigated and decided on the merits in the prior suit, (3) the resolution of the particular issues was necessary to the court's judgment, and (4) those issues are identical to issues raised in the subsequent suit.

Danzl and Baker, as the parties asserting preclusion, bear the "heavy burden" of "showing with clarity and certainty" what was determined by the prior judgment (*Jones*, 757 F.2d at 885 (citations omitted)). They have not met that burden here for several reasons.

First, it is unclear from the record of the Hearing provided this Court (SA Mem. Ex. I) whether the excessive force issue was actually litigated before the state court. That record contains only the prosecution's description of what a particular witness would have testified to, if called, concerning a May 2, 1984 medical examination of de La Paz. Afterwards, the record shows (*id.* at 3–5), de La Paz displayed his body scars to Judge Gillis. Based on that scanty record this Court cannot conclude the excessive force claim was "actually litigated" in the state court.

Second, both the record and Judge Gillis' opinion persuade this Court he focused not on whether the force used during the arrest was excessive but instead on whether there was a causal connection between whatever physical force was exerted and de La Paz's statement about his car. It was only after he found there was not a causal connection that Judge Gillis went on, in a single sentence and without analysis, to "further find" the physical force used was reasonable. That last statement was not "necessary to the court's judgment."

Third, even if the first two points were ruled on the other way, Arrest Mem. 2 correctly points out de La Paz's motion to suppress was *granted* based on the police's failure to give a Miranda warning. Thus Judge Gillis' contemporaneous rejection of physical coercion as a basis for the same motion was pure dictum, in no way "necessary" to his judgment.

Finally (and relatedly), de La Paz cannot be said in the legal sense to have had a "full and fair opportunity" (*Jones*, 757 F.2d at 885) to litigate the unreasonable force issue. Having won the war (the suppression motion), he had no way to contest via appeal, and he similarly had no incentive to argue via a motion to reconsider before Judge Gillis, whether he had really lost the excessive-force battle in the sense that has *now* been made critical.

Any one of those answers, let alone all four collectively, is fatal to the applicability of issue preclusion. This Court must address the merits of the excessive force claim.

### Deprivation of Liberty

Use of excessive force by the police during an arrest violates the Constitution (and not simply state tort law) only if the conduct "was so egregious or intolerable as to shock the conscience of the court," *Gumz*, 772 F.2d at 1400. That is so because, as *Gumz* teaches (*id.*) (citation omitted):

> The right protected by the Fourteenth Amendment in the context of claims of excessive force is "the right to be free of state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as to literally shock the conscience of the court."

Under the three-part test adopted in *Gumz* (*id.*), excessive force is unconstitutional if it (1) caused severe injuries, (2) was grossly disproportionate to the need for action under the circumstances and (3) was inspired by malice rather than merely carelessness or unwise excess of zeal, so that it amount-

ed to an abuse of power that shocks the conscience.

 This Court need reach only the first of those requirements, for there is no evidence Danzl and Baker caused severe injury to de La Paz by the alleged beating. De La Paz has made only bald assertions of injury—first in the Complaint, and now in his less serious contentions made via affidavit (obviously to meet the requirement that a party must not rest on mere allegations in pleadings when responding to summary judgment, *Powers v. Dole*, 782 F.2d 689, 694 (7th Cir.1986)). But such conclusory assertions (even in an affidavit), *wholly absent evidentiary material,* are insufficient to create a genuine issue of fact in the face of uncontradicted medical evidence showing de La Paz had only slight and superficial bruising, to his left wrist and middle back respectively, 72 hours after the arrest.[14] *Thornton v. Evans*, 692 F.2d 1064, 1076 n. 29 (7th Cir.1982) has put the test this way:

> As we previously suggested, in many cases, summary judgment is proper when the nonmoving party does not respond with evidentiary material.

Arrest Mem. 3 merely attempts to explain away the medical evidence by observing "significant healing could have occurred in the interim [72 hours]." But that feeble argument serves only to belie de La Paz's contention his injuries were severe. What de La Paz is left with, absent any evidence of bodily injury, is damage to his leg brace: It was "cracked" but still functional after the alleged beating. This Court finds neither that nor anything else in the record shows a "severe injury." It

therefore concludes, as a matter of law, de La Paz has no Fourteenth Amendment excessive force claim.

### Denial of Adequate Medical Care

De La Paz's second Section 1983 claim asserts both (1) a total denial of medical care for a time while in the Jail (Complaint ¶¶ 3, 8 and 9) and (2) inadequate care thereafter (Medical Aff. ¶¶ 1–2 and Medical Mem. 3). As with his excessive force claim, de La Paz does not identify the constitutional basis for his claim. Both sides, in briefing the summary judgment motion, have assumed it is to be found in the Eighth Amendment (prohibition of cruel and unusual punishment) as incorporated by the Fourteenth. They have therefore focused on whether de La Paz can prove a "deliberate indifference to serious medical needs" as required under that Amendment (*Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)).

 But Eighth Amendment standards do not apply to de La Paz, for the alleged denial of adequate medical care occurred while he was a pretrial detainee not yet convicted of any crime. Instead his claim is properly analyzed under the Due Process Clause prohibition of punishment (or conditions imposed for the purpose of punishment) before conviction of a crime, *Bell v. Wolfish*, 441 U.S. 520, 535–36 & n. 16, 99 S.Ct. 1861, 1871–72 n. 16, 60 L.Ed.2d 447 (1979); see also *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) (Due Process Clause requires the provision of medical care to those injured while being apprehended by police).

---

**14.** Nor is this Court compelled to blind itself to the gross exaggerations de La Paz has displayed on that score. Had he in fact (as his Complaint ¶ 1 claimed) been kicked in the face and sustained facial injuries, that night's photographs (taken just two hours after the arrest) surely would have revealed bruising, cuts or, as de La Paz himself describes (Complaint ¶ 2), scars. For Arrest Mem. 2 to assert those photos are now irrelevant, on the ground de La Paz has now revised his allegations (in his Arrest Aff.) to claim blows only below the face, simply undermines his credibility. While a court may not

assess the credibility of a witness in deciding a summary judgment motion, it may under some circumstances find a witness "incredible as a matter of law" (*Stewart v. RCA Corp.*, 790 F.2d 624, 628 (7th Cir.1986)). This Court might well discredit de La Paz's present assertion he did not sustain blows to the face, and thus consider the facial photos as evidence there was no severe injury of *any* kind. That line of analysis need not be pursued, however, because of the other medical evidence supporting this opinion's conclusion.

■ SA Mem. 2 urges summary judgment is appropriate because de La Paz really asserts only "improper" medical care, which does not amount to a constitutional violation. In any event, the Memorandum says, Doctors Shaker (as to whom the issue is moot, see n. 2) and Romaine have qualified immunity from liability (SA Mem. 4) and Hardiman is not liable because he had no personal involvement in or knowledge of the alleged deprivation (*id.* at 1–2). Because de La Paz was not denied adequate medical treatment in violation of the Due Process Clause for the reasons described below, this Court need not reach the secondary questions just mentioned.

*Bell*, 441 U.S. at 538–39, 99 S.Ct. at 1873–74 (citations and footnotes omitted, brackets in original) expressed the Due Process Clause standard applicable to constraints and conditions imposed on pretrial detainees:

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.... Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable to it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." ... Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

Most courts have been called upon to apply that test in the context of deciding whether restrictions on pretrial detainees are reasonably necessary to ensure the detainees' presence at trial; see, e.g., *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1350–51 (7th Cir.1985). Very few have had to do so in the course of deciding whether an alleged denial of medical care violates the Due Process Clause. *Hamm v. DeKalb County*, 774 F.2d 1567, 1573 (11th Cir.1985) (citations omitted), *cert. denied,* — U.S. ——, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986) explained the difficulty of such an analysis:

> Application of the *Bell v. Wolfish* standard to those areas [basic necessities such as food, living space and medical care] is exceedingly difficult and does not provide clear results. Clearly, states forever can improve the quality and quantity of the food, living space, and medical treatment that they provide those incarcerated merely by increasing and properly administering the amount of money they spend on a detention facility. Thus, a state's decision to maintain at a reasonable level the quality of food, living space, and medical care rather than improve or increase its provisions of those necessities serves a legitimate purpose: to reasonably limit the cost of detention. It is equally clear that the due process clause does not purport to regulate the general conditions and quality of life in the country's jails, and that the courts should not attempt to make "judgment calls" to determine which of various marginally different conditions might be more appropriate.

After examining the issue, *Hamm, id.* at 1573 concluded "[d]ue process must require states to provide pretrial detainees with some minimal level of these necessities," but it held (*id.* at 1574) the Eighth Amendment "deliberate indifference" standard should be applied to both prisoners and pretrial detainees because of the difficulty of applying two separate standards.[15]

15. *Hamm, id.* noted many city and county jails house convicted prisoners as well as pretrial detainees, so that attempting to distinguish

Eighth Amendment and due process standards by evaluating "details of slight differences in conditions" would "result in the courts' becom-

Our own Court of Appeals has not addressed what level of medical care is required under the Due Process Clause. In a pre-*Bell* decision, *Duran v. Elrod*, 542 F.2d 998, 999–1000 (7th Cir.1976) suggested there are conditions that might not violate the Eighth Amendment when imposed on convicted prisoners, but would violate the Due Process Clause if imposed on a pretrial detainee:

> While the decisions that have interpreted the Cruel and Unusual Punishment Clause may be valuable by analogy as defining that which may never be imposed on an inmate, whether convicted prisoner or pre-trial detainee, a more stringent standard controls the treatment by the state of pre-trial detainees.

But *Duran* involved a challenge by pretrial detainees to such restrictions as lack of visiting privileges and telephones, and the question was whether those restrictions were reasonably necessary to ensure their presence at trial. There is no clue as to whether a more stringent standard also controls where pretrial detainees allege inadequate medical care.[16]

Even were this Court to apply a more stringent standard, so that de La Paz need not show "deliberate indifference" to his medical needs, as a matter of law there was still no Due Process Clause violation here. In the face of overwhelming evidence he *was* provided medical treatment, his Medical Mem. 3 now concedes it is only the adequacy of medical care de La Paz challenges:

The abundance of records produced by these defendants suggests at best a quantity, but it does not establish a quality which would necessarily indicate anything above and beyond deliberate indifference. It is a question of fact whether the treatment afforded the Plaintiff was inadequate in the face of an obvious need for such attention, *Westlake v. Lucas,* supra.

But even viewing the evidence in a light most favorable to de La Paz, the alleged inadequacy in medical care does not come close to stating a Due Process Clause claim. What the evidence shows *at best* is (1) de La Paz had a serious medical problem related to his kidney when he entered the jail, (2) he was not given medication to ward off urinary infection during the first two weeks in the jail, (3) the medication provided him after two weeks was not the medication of his choice, (4) there was a delay before he was fitted for a new leg brace and received supplies of catheters and (5) he suffered temporary discomfort because of the delay.

*Thomas v. Pate*, 493 F.2d 151, 159 (7th Cir.), *vacated on other grounds sub nom. Cannon v. Thomas*, 419 U.S. 813, 95 S.Ct. 288, 42 L.Ed.2d 39 (1974) teaches a delay in medical treatment states a claim only if it causes "substantial harm." De La Paz Second Aff. ¶¶ 2–3 does not assert (nor is there any evidence to support) a claim he contracted pseudomonis because Dr. Mallek prescribed bacterium rather than anoth-

---

ing 'enmeshed in the minutiae of prison operations,' a situation against which the Supreme Court has warned."

**16.** *Wood v. Worachek,* 618 F.2d 1225 (7th Cir. 1980), decided more than three years after *Duran,* upheld a district court's finding that police officers had violated a pretrial detainee's *Eighth Amendment* right by denying him proper medical treatment. There was no discussion of whether a different standard should be applied to pretrial detainees under the Due Process Clause, let alone what that standard might be. *Matzker v. Herr,* 748 F.2d 1142 (7th Cir.1984), the most recent Seventh Circuit case examining a pretrial detainee's allegation of a denial of medical care, found the denial to be an Eighth Amendment violation—so once again there was

no occasion to decide whether a lower hurdle might have to be overcome by a pretrial detainee. *Matzker, id.* at 1147 (citations and footnote omitted) dealt with a pretrial detainee who had sustained permanent injury to his eye and teeth after a three month delay in medical treatment:

> As our court has held, a jailer may violate a convicted prisoner's Eighth Amendment rights by failing to "promptly and reasonably procure medical aid" for a prisoner who suffers a serious illness or injury.... Accordingly, a pretrial detainee's due process right to be free from punishment is violated when a jailer fails to promptly and reasonably procure competent medical aid for a pretrial detainee who suffers a serious illness or injury while confined.

er medication de La Paz had requested. And de La Paz's conclusory allegations of damage to his kidney, in the total absence of evidence contradicting the medical evidence supplied by defendants, is simply insufficient to withstand summary judgment.

In sum, this Court concludes de La Paz at most suffered temporary discomfort from an alleged delay in medical care. Accordingly it holds as a matter of law there has been no Due Process Clause violation.

### Conclusion

There are no genuine issues of material fact, and defendants are entitled to a judgment as a matter of law. This action is dismissed.