**Oscar BROWN, Jr., Plaintiff,**

v.

**Deputy Sheriff B. TRICHE, Defendant.**

No. 85 C 3229.

United States District Court,
N.D. Illinois, E.D.

May 11, 1987.

Charles Hoffman, Margaret Byrne, Chicago, Ill., for plaintiff.

Lawrence T. Krulewich, Mark P. Strada, Asst. State's Atty., Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

Oscar Brown, Jr. ("Brown") has sued Cook County Deputy Sheriff Bernard Triche ("Triche") for asserted constitutional violations (a claim brought under 42 U.S.C. § 1983, with jurisdiction conferred by 28 U.S.C. §§ 1331 and 1343) and for assault and battery under Illinois common law (a claim relying on pendent jurisdiction), by reason of physical injuries gratuitously inflicted by Triche upon Brown. This Court conducted a bench trial by agreement of the parties, and it now finds the facts specially and states its conclusions of law thereon, as required by Fed.R. Civ.P. ("Rule") 52(a), in the following Findings of Fact ("Findings") and Conclusions of Law ("Conclusions").[1]

---

1. To the extent (if any) these Findings may be deemed conclusions of law, they shall also be considered Conclusions. To the extent (if any) matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings.

*Findings of Fact*[2]

1. On January 17, 1985[3] Brown was a pretrial detainee in the custody of the Cook County Department of Corrections ("Department"), awaiting trial on a theft charge. That morning Brown was transported from Department's jail facility at 2700 South California Avenue, Chicago to the Cook County Courthouse in Markham (the "Courthouse") for a court appearance in his pending case. At that time Brown was 49 years old.

2. On January 17 Triche was a Cook County Deputy Sheriff assigned to transport prisoners (including transportation within the Courthouse) and to maintain order and decorum in the Courthouse. At that time Triche was 29 years old, 5' 7" tall and weighed 190 pounds, having taken self-defense training and having been a "leisure weightlifter" since his teenage years. Since 1977 Triche had been assigned to serve as the personal officer to Judge Howard Miller (then presiding over Courtroom 106 in the Courthouse), initially serving as Judge Miller's personal driver, then acting both as his driver and as his courtroom security officer.

3. On January 17 Triche was directly assigned to Courtroom 106. That courtroom was adjacent to Courtroom 105 (the courtroom of Judge Cornelius Houtsma, Jr.), where Brown's case was assigned and where Deputy Sheriff John Daily ("Daily") was assigned for security purposes.

4. Courtrooms 105 and 106 are connected by a hallway, 25½' long and 4' wide. Off that hallway are two lockup rooms, one adjoining each of Courtrooms 105 and 106, used to hold the prisoners who appear in the respective courtrooms. Between the lockup rooms is an elevator leading down to the main lockup facility in the Courthouse's lower level. There is a conference room (12' 8" x 11' 6") across from each lockup room, one adjacent to each courtroom. PX 1 accurately depicts the room layout, though not precisely to scale.

5. Each lockup room's door has a transparent window (14½" square) facing the hallway. Across the hall, each conference room has a large window (8' 10" long by 3' 6" high). Any person standing at the lockup room door can thus see across the hallway into the corresponding conference room serving the same courtroom.

6. On January 17 each conference room contained a wooden table (3' wide by 7' long) and a number of metal chairs. At least some of the chairs in the Courtroom 105 conference room were against a wall of that room (though there was no testimony that this Court considered a sufficiently credible basis for finding the precise number or the precise location of those chairs).

7. After Brown was taken from the Courtroom 105 lockup to Courtroom 105 itself for his January 17 court appearance, he was returned to the same lockup. On completion of like appearances by other pretrial detainees, there were at least six or seven others in that lockup as well. Judge Houtsma then resumed a jury trial in Courtroom 105 at about 11:15 a.m., only to have the trial interrupted by noise coming from the lockup area about 11:30 to 11:45 a.m.

8. It was an ordinary occurrence for inmates in the lockup to create noise when their court appearances had already been called and the noon hour approached. If a prisoner missed the 1 p.m. bus from Markham back to Department's jail facility in Chicago, the next bus did not leave until very late that afternoon (it was unclear whether that was as late as 6 p.m., as Brown testified, or at least some other time after 4 p.m.). In any event, missing the 1 p.m. bus therefore meant missing a hot evening meal, and the inmates frequently made noise to remind the officers of the need to take them to the downstairs lockup area in time to be transported back by that first bus.

9. At or shortly after 11:30 to 11:45 a.m., Triche was in the corridor area between Courtrooms 105 and 106 to transport prisoners from the Courtroom 106 lockup to the lower level lockup, and he heard the

**2.** See the Appendix to the opinion as to the determinations of credibility this Court has made in connection with these Findings.

**3.** Because all the operative events took place during 1985, all future references to dates in these Findings will omit the year designation.

noise being made by the detainees in the Courtroom 105 lockup. After Triche had moved the prisoners to the lower level and had returned to the same corridor area, he again heard noise coming from the Courtroom 105 lockup and was concerned about its disrupting the proceedings in both courtrooms. Triche knew Judge Miller was unusually sensitive to noise, and Triche was aware of and concerned about any such disturbance that might upset Judge Miller.

10. Triche identified Brown as the source of the disturbing noise from the lockup.[4] Triche unlocked and opened the door to the lockup and told Brown to step out into the hallway. Brown did so and Triche handcuffed Brown behind his back, with Brown offering some moderate but not violent resistance and simultaneously asking whether something was wrong and what it was all about. After Brown was handcuffed behind his back, Triche pushed Brown toward the conference room. Brown entered the conference room, followed by Triche and then Daily (who had come up in the meantime). All this had occurred before Cook County Adult Probation Department Officer Terrence Kavanaugh ("Kavanaugh") came into the corridor (see Appendix).

11. While Triche, Brown and Daily were in the conference room, Triche—loudly and firmly—ordered Brown to sit down. Brown did not engage in a shouting match as Triche claimed (see Appendix as to Kavanaugh's impartial version). Instead he continued to ask in quiet conversational tones whether anything was wrong and what the explanation was for what was going on (this occurred both before and during the time Kavanaugh was in the corridor, hearing and briefly seeing the events). After several repetitions (and after Kavanaugh, seeing the situation apparently under control, had left the scene and returned to Courtroom 106 to report that to Judge Miller), Triche apparently became enraged at what he must have viewed as disobedience and obstructionism on Brown's part.

12. At that point Triche overreacted seriously to Brown's failure to obey Triche's "Sit down!" commands and to Brown's continued quiet questioning of Triche as to what was wrong. Whatever caused Triche to lose his temper (whether Triche felt provoked by what he viewed as Brown's resistance to authority, or Triche simply vented his spleen, or there was some other triggering motivation), what occurred next was an unreasonable—and inexcusable—course of conduct by Triche:

(a) Triche grabbed Brown's coat by the lapels and pushed him back against the wall, so that Brown's body and head struck the wall.

(b) Triche struck Brown several times in the face and head (and perhaps the neck) with Triche's fist.

(c) If Triche did not punch Brown in the neck (below Brown's chin), Triche kicked him there after Brown had slumped to his knees as the result of Triche's punches.

In any case, as the direct result of Triche's physical attack on Brown, Brown fell initially to his knees and then to the conference room floor, temporarily unconscious. Following the attack Brown lay on the floor, bruised and bleeding, with his hands cuffed behind his back.

13. At that point Triche left the conference room, locking the door, and went to Courtroom 106 to telephone for security officers to come to the conference room.[5]

---

**4.** Brown denies that—a denial that is another illustration of each litigant's testimony (like that of their friendly witnesses) reflecting an effort to portray himself as wholly without fault. It appears likely that Triche exaggerated Brown's involvement, just as Brown minimized it. But in any event it is really immaterial whether Brown was actually doing what Triche claimed, for the important fact (though Brown apparently does not realize it) is that Triche *believed* Brown to be the offender (or at least the principal offender) causing the noise. Indeed, that represented the obvious motive for Triche's later wilful and egregious treatment of Brown.

**5.** It is unclear just where Daily was during this period of time. In any case, however, this Court specifically discredits Daily's story about remaining in the conference room with Brown in a *conscious* condition and cursing. Daily's version, which lacks credibility throughout, is

Before that call could be placed, Triche was told the alarm had already been sounded, so he then returned to the conference room. Within a few moments several Deputy Sheriffs (including Edward Green, Edward Eggleston and James Griffin) came up on the elevator from the main lockup area and came into the corridor area between Courtrooms 105 and 106. Triche then unlocked the conference room door, where the several Deputies then saw Brown lying on the conference room floor in the same position he had occupied when Triche left the conference room moments before.

14. Brown was then removed from the conference room and taken by elevator to the lower level lockup facility. Though he walked from the conference room to the elevator (assisted by Deputies Griffin and Eggleston, one on each side of Brown and each holding one of Brown's arms), Brown was shaky and weak throughout that time and continued in that condition during and after the time he was downstairs. Brown was unquestionably dazed and has no clear current recollection of the events of that period. Nurse Seermon came to the main lockup facility and saw Brown lying on his back on the bench there, with dried blood on his cheeks, nose and upper lip. Before she could examine Brown, he said he had to throw up. Nurse Seermon helped Brown to a sitting position, and Brown proceeded to vomit some clear mucus streaked with blood. Nurse Seermon then examined Brown and determined he should be transported to a hospital. At about 12:12 p.m. an ambulance was called, and it arrived at the Courthouse at 12:17 p.m.

15. Brown was then transported by ambulance to South Suburban Hospital in Hazelcrest, Illinois, arriving at about 12:40 p.m. There he was seen in the emergency room by Nurse Maloney, who noted swelling on his left forehead and right eye orbit, a small laceration on his right eyebrow and abrasions on his neck.

16. Dr. LeCour also saw Brown in the emergency room. She noted his responses when she spoke to him as slow but appro-priate, reflecting a dulled mental status. Brown was oriented as to person and place, but not as to day and time. Dr. LeCour also observed the bump over Brown's left forehead area and the small cut over his right eyebrow area. Blood was coming from both his nostrils, with some swelling overlying his nose, and with a scratch or scrape over the front of his neck. Though there was some tenderness in his abdominal area, no bruising was detected. Because Brown complained of pain in the neck area, x-rays were taken of his spine, skull, chest and nose, revealing no fractures.

17. At about 5:50 p.m. Brown was discharged from the hospital emergency room in "fair" condition, with his mental status having improved but not yet completely normal. Brown was transported by ambulance to Cermak Health Services (part of Department, located at 2800 South California, Chicago, Illinois). There he was seen by Nurse Jackson and Dr. Akbik at about 7:10 p.m. Consistently with all prior observations, Dr. Akbik observed the bruise over Brown's left forehead, a minor laceration over his right eyebrow, what was by now a bluish discoloration over his left eye and the same laceration below his chin. Brown was discharged from Cermak Health Services and placed on sick call for the following day.

18. When Brown was returned to Department's custody that evening, he complained to Department Captain Edward Juras that he had been beaten that morning at the Courthouse. Juras in turn notified Department Investigator Michael Kemp, who interviewed Brown at 8:20 p.m. Investigator Kemp had Polaroid photographs taken of Brown, showing the areas where Brown had been injured. Kemp prepared a report and recommended that a copy of the report and the photographs be forwarded to the Sheriff's Internal Investigations office at the Daley Center in Chicago.

19. At 1:30 p.m. the following day (January 18) Investigator Charles Dee of that office interviewed Brown and prepared a

particularly suspect here as being inconsistent with the physical and objective evidence.

report. Photographs taken in the course of Department's internal investigations are normally kept in the investigative file. That was done with the photographs of Brown taken the evening of January 17, but when a subpoena was issued for such photographs on the following December 13, a search of the files was unsuccessful in locating those photographs.

20. As a result of the injuries inflicted on Brown by Triche, Brown was rendered unconscious for a short period of time (at a minimum, the few moments between the time he slumped to the conference room floor as the result of Triche's attack and the time the other Deputies arrived and found him lying motionless in the same position on that floor). In addition, he suffered continuing physical pain for a period of time (though Brown testified to a two-week period, given the nature and non-permanence of the injuries this Court finds a somewhat shorter period was likely). Importantly, Brown suffered emotional distress and humiliation as a result of the beating inflicted by Triche. Only Brown's account of a resulting fear of being alone with correctional guards is not viewed by this Court as a contributing factor to Brown's damages. Finally, the wholly gratuitous nature of the physical attack on Brown—inflicted at a time when he was helpless to defend himself, and imposed by someone in authority—supports a finding that the imposition of punitive damages on Triche is required to accomplish the goals identified for such exemplary damage awards.

### Conclusions of Law

■ 1. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. Triche admittedly acted under color of law throughout the time and by all his actions identified in the Findings. Jurisdiction of Brown's state-law claim exists under principles of pendent jurisdiction.

■ 2. On January 17, 1985 Triche used excessive force against Brown by beating him when Brown was unable to defend himself (indeed, *no* use of that type of physical force was justified under the circumstances). That conduct by Triche violated Brown's Fourteenth Amendment right to liberty, and it did so without due process of law. True enough, *Gumz v. Morrissette,* 772 F.2d 1395, 1400 (7th Cir. 1985) (citations omitted) articulated a standard for Section 1983 excessive force claims that in part calls for "severe injuries":

> Three of our sister Circuits utilize a three-part standard to provide guidance in making this delicate determination and we adopt the test. According to this standard the use of force by a state officer is unconstitutional if it 1) caused severe injuries, 2) was grossly disproportionate to the need for action under the circumstances, and 3) was inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience.[6]

But later language in *Gumz, id.* at 1401–02 suggests strongly that gratuitous *physical* injury—what the Court calls the "actual use" rather than "an abstract demonstration of force"—is constitutionally actionable even though the victim does not sustain grievous harm with long-lasting effects. This Court holds Brown's Fourteenth Amendment rights violated in conformity with *Gumz,* not in spite of *Gumz.* If our Court of Appeals truly means to insulate conduct by state law enforcement officers such as that involved here, and causing the harms sustained here, that court and not this one must do so.

■ 3. Triche's beating of Brown also constituted an assault and battery under Illinois state law.

■ 4. Triche's conduct described in the Findings was intentional. It was imposed upon Brown wilfully and maliciously (and a fortiori it involved a reckless disregard for Brown's constitutional rights).

■ 5. *Memphis Community School District v. Stachura,* —— U.S. ——, 106

---

**6.** These Findings and Conclusions leave no possible doubt that the second and third standards are more than amply met. It is thus necessary to focus only on the first.

S.Ct. 2537, 2544–45, 91 L.Ed.2d 249 (1986) teaches Brown cannot recover for the abstract violation of his constitutional rights. This Court, aided by the parties' counsels' submissions, has surveyed the cases dealing with the proper measure of damages in cases such as this. Based on the nature of Brown's injuries, on his having been rendered briefly unconscious, on his having been caused to function in a less than normal mental state for several hours, on the pain he suffered and the continuation of the aftereffects of his injuries for a week or two and on the understandable emotional distress and humiliation he suffered, Brown is awarded compensatory damages in the sum of $9,000 (cf. *Taliferro v. Augle*, 757 F.2d 157, 162 (7th Cir.1985)). In light of the circumstances described in the Findings and the determination reflected in Conclusion 4, an award of punitive damages is also required for the classic reasons supporting such awards, and those damages are set in the sum of $15,000 (cf. *id.*).

\*   \*   \*   \*   \*   \*

It is ordered and adjudged that Oscar Brown, Jr. recover of Bernard Triche the sum of $24,000 together with his costs of action (including attorneys' fees and expenses to be awarded under 42 U.S.C. § 1988).

## APPENDIX

This action, with the litigants and their friendly witnesses (Edward Macker ("Macker")[1] for Brown and Johnny Daily ("Daily")[2] for Triche) having given diametrically opposing versions—and with each party's version differing from that of his own friendly witness—poses a classical *Rashomon*-type problem of credibility. None of those four witnesses was viewed by this Court as fully credible, though Brown's lack of credibility came *not* in his

account of Triche's having administered the beating to Brown (an account this Court ultimately credited), but rather in Brown's trying to minimize any pre-beating conduct on his part that Triche might have viewed as provocative.

What has therefore been most significant in resolving the issues is that the evidence from the objective witnesses—Cook County Adult Probation Officer Terrence Kavanaugh ("Kavanaugh") and the medical witnesses discussed below—flatly refutes the version given by Triche. None of those persons had any motive to stretch the truth. Their evidence was both credible and compelling:

1. When Judge Miller in Courtroom 106 (hearing loud voices emanating from the corridor area) asked Kavanaugh to check out what was happening, Kavanaugh went into what he found an empty corridor and then saw Triche, Brown and Daily in the Courtroom 105 conference room. Before he saw them, Kavanaugh heard Triche command Brown to "sit down" in a loud firm voice, then heard Brown's mumbled response—Brown did not shout. When Kavanaugh then looked in at the three in the conference room, they were standing still—Triche and Brown facing each other, with Brown's hands behind his back (wholly consistent with his being handcuffed in that manner)—and the dialogue was repeated. Most critically:

   (a) Brown was *not* then stepping back or falling as both Triche and Daily claimed.

   (b) Kavanaugh heard no banging or falling in the entire ten seconds or so between the time he first entered the corridor and the time he again left the corridor after having heard and seen the scene.

---

1. Macker's testimony came in via deposition over the objection of Triche's counsel. Macker's account suffered from an excess of inventiveness, seeking to be helpful to Brown. Though it is very possible Macker saw part of the beating Triche inflicted on Brown, the totality of his testimony has not been found by this Court to be entitled to much credence. Because these Findings do not rely on that testimony in any material respect, Triche's objection to its admissibility—however groundless this Court found that objection—is really irrelevant.

2. Daily's story was a obvious tissue of lies. It contradicted not only the objectively known facts referred to later in this Appendix, but also Daily's own deposition in a number of respects. If anything, Daily's obviously false testimony damaged Triche's case rather than helping it. No credence at all has been placed in Daily's version.

2. Both Nurse Seermon at the Courthouse lower level lockup facility and Dr. LeCour at the South Suburban Hospital emergency room saw blood that had come from Brown's nostrils. Importantly, the consistent observations of all the medical personnel (Nurse Maloney at the South Suburban Hospital emergency room, Dr. LeCour at the same location and Nurse Jackson and Dr. Akbik at Department's own Cermak Health Services Emergency Room) observed the same injuries in examining Brown: swelling and a bruise on his left forehead, a minor cut and swelling over his right eyebrow, a bluish discoloration over his left eye, a swollen nose (accompanying the bleeding there) *and*—most significantly—an injury (variously described as abrasions, a scratch or scrape and a laceration) on his neck below the chin. All those physical manifestations are wholly inconsistent with the Triche-Daily version of how Brown's injuries were sustained, and are wholly consistent with those injuries having been inflicted by Triche as Brown claimed.

There is thus simply no way in which the injuries unquestionably sustained by Brown could have been—as Triche would have it—the result of Brown's falling in consequence of his moving backward continuously, losing his balance and falling over chairs to the concrete floor of the conference room. Less critical in terms of the injuries themselves, but substantially probative in terms of which version was truthful, is Kavanaugh's total contradiction of the Triche-Daily versions of loud profanity having come from Brown during the episode. In light of all the evidence, this Court has found that Triche (and a fortiori Daily) lied, and the fact of that lying has led this Court to the conclusion Triche inflicted the damages by an attack on Brown, who was then helpless to defend himself because his hands were handcuffed behind his body.