# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 03-3734 & 03-3735

ESTATE OF CHRISTOPHER A. MORELAND,
Deceased by GARY R. MORELAND and
LINDA TUTTLE, Co-Personal Representatives,
GARY R. MORELAND, in his official and
individual capacity, LINDA TUTTLE, in her
official and individual capacity, et al.,

                *Plaintiffs-Appellees, Cross-Appellants*,


                *v.*


ERICH DIETER and MICHAEL SAWDON,

                *Defendants-Appellants*,

           and

JOSEPH SPEYBROECK, in his individual and
official capacities, Sheriff of St. Joseph County,

                *Defendant, Cross-Appellee.*

_____

Appeals from the United States District Court for
the Northern District of Indiana, Hammond Division.
No. 99 C 607—**Allen Sharp**, *Judge.*
_____

ARGUED SEPTEMBER 30, 2004—DECIDED JANUARY 14, 2005
_____

Before ROVNER, WOOD and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*.  This is an action under 42 U.S.C. § 1983 for deprivation of civil rights arising out of the death of an inmate in the St. Joseph County, Indiana jail. Defendants Erich Dieter and Michael Sawdon, former St. Joseph County sheriff's deputies, were found liable for violating Christopher Moreland's civil rights by wrongfully causing his death by the use of unnecessary and excessive force. The jury awarded substantial damages: $29 million in compensatory damages and $27.5 million in punitive damages ($15 million against Dieter and $12.5 million against Sawdon). On appeal Dieter and Sawdon assert evidentiary and instructional errors and also challenge the punitive damages as unconstitutionally excessive. The plaintiffs cross-appeal the district court's order granting summary judgment to Joseph Speybroeck, the sheriff of St. Joseph County. They contend the evidence was sufficient to raise a jury issue about official policy or custom in the jail for purposes of § 1983 liability against the sheriff. We affirm the judgment against Dieter and Sawdon as well as the summary judgment in favor of Sheriff Speybroeck.

## I.  Background

In the early morning hours of October 25, 1997, thirty-year-old Christopher Moreland was arrested by officers of the Mishiwaka Police Department for driving under the influence of alcohol. Moreland behaved erratically during his arrest—for example, by hitting himself in the face—but the police officers testified that Moreland's behavior was not unusual for someone drunk and upset. Moreland was held for about two hours at the Mishiwaka Police Department and then transferred to the St. Joseph County Jail. Although obviously inebriated, Moreland entered the jail on his own power and at approximately 5:50 a.m. was placed in the "drunk tank" along with two other detainees.

Almost as soon as he was in the drunk tank, Moreland provoked a confrontation by directing racial slurs at Reginald Coleman, one of the other detainees in the tank. Sergeant Paul Moffa, the shift supervisor on duty that night, responded to the disturbance and entered the tank with another officer. Moffa grabbed Moreland by the neck or shoulders, threw him to the floor, removed a canister of OC-10 pepper spray[1] from his waist, and sprayed Moreland's face from a distance of roughly four or five inches. Coleman took cover underneath a blanket as pepper spray filled the air, but he heard a struggle between Moreland and Moffa and at one point heard what he said was "the sound of a basketball bouncing off concrete." The other inmate in the drunk tank said it sounded like "a melon popping, like dropping a watermelon." They surmised this was the sound of Moreland's head hitting the concrete floor.

The officers handcuffed Moreland behind his back and dragged him out of the drunk tank to a nearby elevator. They set him down on the floor in front of the elevator and prepared to take him to the shower on the fourth floor to wash off the pepper spray. Two other officers, Albright and Holvoet, accompanied Moreland in the elevator to the fourth floor. Moffa, who had been hit by pepper spray ricocheting off Moreland, stayed behind on the first floor. Moreland thrashed about as he was taken upstairs; Albright and Holvoet tried to restrain him by pinning him to the elevator floor.

When the elevator doors opened at the fourth floor cell block, Dieter was waiting to meet them. Holvoet told Dieter that Moreland was the guy "who got Moffa sprayed." Albright testified that he thought this comment was a signal from

---

[1]  OC-10 is a 10-percent solution of oleoresin capsicum. It causes involuntary closure of the eyes, respiratory inflammation, and temporary loss of muscular strength and coordination.

Moffa to Dieter, his close friend, that Moreland had some "payback" coming. Sawdon arrived on the fourth floor shortly after Moreland and the others.

Dieter lifted Moreland up and hauled him over to the shower. Witnesses testified that Dieter pushed Moreland into the shower with such force that Moreland hit his head against the far wall. Albright testified that Dieter held Moreland from behind and accelerated toward the shower until the two men smashed into the far wall, crushing Moreland between the wall and Dieter's own body. Dieter or another officer turned on the hot water, which exacerbates the pain of pepper spray. In response to Moreland's cries from inside the shower (the defendants maintained he was belligerent, but other officers and witnesses testified that he was crying out for help), Sawdon said to the other officers, "Hey, guys, do you want to see something funny?" He then threw a five-gallon bucket of cold water over Moreland. Other officers gathered outside the shower, watching and laughing as Moreland, still handcuffed, lay with his head in a shallow puddle of water, spit, and mucus, trying to wash the pepper spray off his face.

Dieter and Sawdon then dragged Moreland from the shower and strapped him into a "restraint chair." Designed to control or impair an aggressive inmate who may endanger an officer or another inmate, the "Pro-Straint Restraining Chair" enables officers to shackle and tie down an inmate while keeping him in a seated, upright position. Moreland remained handcuffed while in the restraint chair. According to several inmates who observed what happened from inside their cells, Moreland sat in the restraint chair for several minutes, cursing and yelling at the defendants and asking them why they were doing this to him. According to the inmates, Sawdon kept telling Moreland to shut up. Then Sawdon went into the guard tower at the center of the floor and came out with an OC-10 canister. He approached Moreland and discharged the canister in his face while he

was still strapped in the chair. Officers who arrived on the fourth floor shortly thereafter reported noticing the unmistakable residual odor of an OC-10 blast. Some witnesses also reported hearing the sounds of Moreland being beaten during this time.

Dieter and Sawdon then removed Moreland from the restraint chair and forcibly put him back into the shower again. Some time later the defendants put Moreland back in the restraint chair and moved him into a nearby "attorney's room," out of view of the other inmates. Connie Spicer, the jail's medication aide, arrived on the fourth floor around this time and examined Moreland, whom she described as slouched back in the restraint chair, moaning, and unresponsive. She saw that Moreland had a cut above his left eyebrow that had bled profusely. Dieter and Sawdon told her that Moreland had slipped and fallen. She placed a bandage over the cut. Spicer told the officers that Moreland should be taken to the hospital; however, she testified that Moffa, Dieter, and Sawdon did not want to do this because their shift was ending and transferring Moreland to the hospital would require them to remain at work. Spicer believed (incorrectly, it seems) that she did not have the authority to order the officers to transport Moreland to the hospital. Moreland remained in the restraint chair in the attorney's room, and at 7 a.m. the night shift personnel, including the defendants, left the jail.

Two day shift officers, Wilson and Johnson, found Moreland unconscious in the attorney's room shortly after 7 a.m. They noticed a large lump on the back of his head, injuries to the front of his face, and a bandage over the cut above his left eye. Wilson took Moreland, still unconscious, to the first floor, changed his clothing, and placed him back in the drunk tank. Spicer saw Moreland in the tank around 9:40 a.m., coughing and unresponsive. At 11:00 a.m., when she checked on him again, Moreland had not moved. The next time she checked Moreland was blue, cold, and lifeless.

Moreland was pronounced dead at approximately 1:23 p.m. The coroner and other forensic experts testified that the cause of Moreland's death was an acute subdural hematoma that could only have occurred during the period of time Moreland was confined in the St. Joseph County Jail.

Moreland's estate and parents sued numerous parties, most of whom either settled or were voluntarily dismissed. Sheriff Speybroeck was sued in his official and individual capacities; the district court granted his motion for summary judgment. A trial was held on the claims against Moffa, Dieter, and Sawdon. The jury found Dieter and Sawdon liable, but could not reach agreement on Moffa and a mistrial was declared as to him. The jury returned damages verdicts as follows: $29 million in compensatory damages; $15 million in punitive damages against Dieter and $12.5 million against Sawdon. The case against Moffa was retried, resulting in a verdict in his favor. Dieter and Sawdon appealed the judgment against them, and the plaintiffs cross-appealed the grant of summary judgment to Speybroeck.

## II.  Analysis

### A.  Admission of Videotaped Interviews of Defendants

St. Joseph County initiated an investigation of Moreland's death, and the defendants were interviewed several times by investigators from the Special Crimes Unit. The interviews were videotaped, and the tapes were used in a federal civil rights prosecution against the defendants, who were acquitted. The defendants objected to the plaintiffs' use of the videotapes on hearsay grounds and pursuant to Rule 403 of the Federal Rules of Evidence. The district court allowed portions of the videotapes to be played for the jury, with occasional pauses for live witness testimony. The defendants argue on appeal that the videotapes were unfairly prejudicial and should have been excluded under Rule 403, especially because the district court refused to admit evidence of the

acquittals. They also appear to suggest that the district court's limiting instruction was inadequate.

We review the district court's decision to admit or exclude evidence for abuse of discretion, and the same standard applies to our review of the district court's limiting instruction. *United States v. Fawley*, 137 F.3d 458, 464 (7th Cir. 1998). "Because the trial court is in the best position to make decisions regarding jury guidance and evidentiary matters, the appellate court must give special deference to the rulings of the trial court." *Id.* The defendants argued in the district court that the videotaped interviews should be excluded because the interrogators' questions to Dieter and Sawdon—some of which incorporated information gathered by investigators looking into Moreland's death—were hearsay. They now concede that the interrogators' questions were not hearsay because they were offered to provide context for the defendants' statements in the interviews and were not offered for their truth. *United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002) (informant's side of recorded conversation with defendant provided context for the recorded conversation and was not hearsay). The defendants argue instead that the interrogators' questions were at times inflammatory and so laden with information from other sources in the investigation as to be unfairly prejudicial under Rule 403. This prejudice, they assert, was compounded by the district court's refusal to admit evidence of the acquittals.

Having viewed the videotapes in their entirety, we find no abuse of discretion. The jury saw what was actually the third interview with Sawdon, recorded two days after Moreland's death. In this interview, which Sawdon himself requested, Sawdon and the investigating officer, Sgt. Richmond, discuss Sawdon's admission that two days earlier he had prepared a misleading report about Moreland's death. Sawdon appears concerned about the repercussions of his false report, and Richmond tries to get him to come clean with the details of the night Moreland died. But apart from the false report,

Sawdon does not actually admit to any wrongdoing. He blames Dieter for being too rough with Moreland but is not sure whether Dieter truly injured him. Much of the interview focuses on Sawdon's state of mind, as he is extremely depressed about what might happen to him. Richmond appears impatient but is generally friendly in the interview (or was trying to appear so); he thanks Sawdon for coming clean about the false report and expresses concern for Sawdon's emotional well-being. When Richmond leaves the room, Sawdon breaks down crying.

Two videotaped interviews with Dieter were admitted, and they are markedly different than Sawdon's. After listening at length to Dieter's account of the night in question, Richmond accuses him of lying, pointing out that Dieter's story is contradicted by the accounts of numerous witnesses. At one point Richmond, visibly upset, abruptly leaves the room and is replaced by another investigator, evidently a friend of Dieter's family, who adopts a conciliatory tone but expresses suspicion that Dieter is not being truthful. Dieter's account of what he did to Moreland changes as the interviews progress. For example, at first he says that he "turned Moreland over" as Moreland lay on the floor, but after questioning admits to dropping a handcuffed Moreland to the ground from a height of roughly three feet and then falling on top of him with his full weight. The tone of the interviews is confrontational, and Dieter is evasive or defensive throughout. When Dieter is left alone in the interview room, he sits impassively, showing no emotion.

The videotapes were surely prejudicial, especially to Dieter, but only *unfairly* prejudicial evidence is subject to exclusion. *Kelsay v. Consolidated Rail Corp.*, 749 F.2d 437, 443 (7th Cir. 1984). Evidence is unfairly prejudicial under Rule 403 "if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *United States v. Vretta*, 790 F.2d 651, 655 (7th Cir.), *cert. denied*, 479 U.S. 851, 107 S.Ct. 179,

93, L.Ed.2d 115 (1986). In weighing the probative value of the challenged evidence against the danger of unfair prejudice under Rule 403, the district court is engaged in "a comparison of intangibles" and is thus "afforded a special degree of deference: '[o]nly in an extreme case are appellate judges competent to second-guess the judgment of the person on the spot, the trial judge.' " *United States v. Glecier*, 923 F.2d 496, 503 (7th Cir.), *cert. denied*, 502 U.S. 810, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991) (quoting *United States v. Krenzelok*, 874 F.2d 480, 482 (7th Cir. 1989)).

The danger of unfair prejudice was not so extreme here that the district court's decision to admit the videotaped interviews is called into question. As a record of the defendants' respective versions of the events leading up to Moreland's death, the tapes are highly probative of their actions, state of mind, and credibility. The interviews are not so dramatic, confusing, or misleading as to induce the jury to disregard the other evidence or to decide the case on an improper basis. The district court indicated its willingness to give the defendants substantial leeway to introduce evidence concerning Richmond's interrogation techniques in order to ameliorate any prejudicial effect of those techniques, but the defendants passed up the opportunity.

We also reject the defendants' argument that the admission of the videotaped interviews was unfairly prejudicial because the jury knew they were connected to a criminal investigation but was not allowed to hear evidence that the defendants had been acquitted of the criminal charges brought against them. Evidence of acquittal in a criminal action is generally irrelevant and inadmissible in a civil case involving the same incident "since it constitutes a 'negative sort of conclusion lodged in a finding of failure of the prosecution to sustain the burden of proof beyond a reasonable doubt.' " *Borunda v. Richmond*, 885 F.2d 1384, 1387 (9th Cir. 1989). *See also Donald v. Rast*, 927 F.2d 379, 381 (8th Cir. 1991); *Royal Exchange Assurance v. Fraylon*, 228

F. 2d 351, 354 (4th Cir. 1955). The district court did not abuse its discretion in excluding the acquittal evidence, and the videotaped interviews were not rendered unfairly prejudicial under Rule 403 because of the absence of this evidence.

Finally, the defendants appear to suggest that the district court's limiting instruction was inadequate, but this argument is not developed. The court instructed the jury as follows: "As you were informed at the outset of this trial, two defendants on trial here [Dieter and Sawdon] were the subject of criminal proceedings. Neither that fact nor the result of those proceedings have any relevance to this case." The defendants have identified no authority, in this circuit or elsewhere, casting doubt on the propriety of this kind of instruction, and we have been unable to find any ourselves.

## B.  Dr. Lustgarten's Expert Testimony

The defendants also challenge the district court's admission of a portion of the testimony of Dr. Gary Lustgarten, a board-certified neurologist and neurosurgeon who testified concerning the cause of Moreland's death. They argue that Lustgarten's opinion as to where Moreland received his fatal injury was not scientific in the sense required by Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 597 (1993).

The parties dispute whether the defendants preserved this issue for appeal. The record reflects that the defendants challenged another expert's testimony on *Daubert* grounds before trial, and the district court expressed some dissatisfaction with the requirements of *Daubert* as a general matter. Then, during Lustgarten's testimony, when the plaintiffs' attorney asked whether the expert had an opinion as to where the injury that caused Moreland's death occurred, the defendants' lawyer objected in the following terms:

> MR. KUS: Objection; based on hearsay, Your Honor. He has to believe a certain set of witnesses and testimony—unless you're talking about where in the body, but I think he's talking about where it occurred in the location, so I'll make that objection.
>
> THE COURT: The objection is overruled.

It is hard to discern even the germ of a *Daubert* challenge in this objection. The defendants' *Daubert* challenge to the testimony of a *different* expert hardly suffices to preserve the argument against Lustgarten. Their failure to address a *Daubert* challenge to Lustgarten's testimony is not excused by the district court's expression of dissatisfaction with the requirements of *Daubert.* The issue was forfeited.

Plain error review of a forfeited evidentiary issue in a civil case is available only under extraordinary circumstances when the party seeking review can demonstrate that: (1) exceptional circumstances exist; (2) substantial rights are affected; and (3) a miscarriage of justice will occur if plain error review is not applied. *Stringel v. Methodist Hosp. of Ind., Inc.*, 89 F.3d 415, 421 (7th Cir. 1996); *Prymer v. Ogden*, 29 F.3d 1208, 1214 (7th Cir. 1994). The defendants have not even attempted to meet this standard.

## C.  Punitive Damages

The jury awarded $15 million in punitive damages against Dieter and $12.5 million against Sawdon, in addition to assessing compensatory damages at $29 million. The defendants do not directly attack the punitive damages award—they do not argue, for example, that the evidence is insufficient to sustain an award of punitive damages under the "reckless or callous indifference" standard for punitive damages in § 1983 actions. *See Smith v. Wade*, 461 U.S. 30, 55 (1983). Rather, they challenge the size of the awards as constitutionally excessive under *BMW of North America, Inc. v. Gore*,

517 U.S. 559 (1996); *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001); and *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003).

In *Gore* the Supreme Court "instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Campbell*, 538 U.S. at 418 (citing *Gore*, 517 U.S. at 575). Review of a constitutional challenge to a punitive damages award is *de novo*, which operates to "ensure[ ] that an award of punitive damages is based upon an 'application of law rather than a decisionmaker's caprice.' " *Id.* (quoting *Cooper Industries*, 532 U.S. at 436; quoting *Gore*, 517 U.S. at 587).

The degree of reprehensibility is the most significant factor. *Campbell*, 538 U.S. at 419. The defendant's conduct is evaluated according to five variables: (1) whether the harm was physical or economic; (2) whether the conduct evinced an indifference to or reckless disregard for the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions; and (5) whether the harm was the result of malice, trickery, or deceit, or mere accident. *Id.* We presume that the "plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant imposition of further sanctions to achieve punishment or deterrence." *Id.*

The defendants' conduct in this case qualifies as truly reprehensible. Taking the facts in the light most favorable to the verdict, *Roy v. Austin Co.*, 194 F.3d 840, 842 (7th Cir.

1999), the defendants' conduct was malicious and cruel, evincing a clear intent to cause Moreland great pain and suffering. To throw a man's head against concrete when he is handcuffed and presents no threat is clearly excessive and malicious. To discharge a canister of pepper spray into the face of a fully restrained, incapacitated individual is vicious and unconscionable. Moreland was roughed up repeatedly before the defendants ultimately ceased abusing him. In the end, the defendants placed Moreland in the attorney's room, shackled and strapped into the restraint chair, leaving his medical needs unattended.

The defendants' assault on Moreland was sustained rather than momentary, and involved a series of wrongful acts, not just a single blow; and Moreland died from the injuries inflicted by the defendants. All this exacerbates the reprehensibility of their behavior. Although it was not possible to determine which of Moreland's head traumas caused the fatal hematoma, Moreland clearly received more than one injury at the defendants' hands. The evidence also shows that the prolonged nature of the assault compounded Moreland's suffering. That the defendants knew Moreland was suffering but continued to abuse him is obvious from nearly all the testimony presented at trial. The jury clearly disbelieved the defendants' versions—that they were merely reacting to Moreland's own violent attempts to avoid being restrained and showered.

Finally, the defendants lied to the nurse and filed false reports to conceal their wrongdoing. The evidence supports a conclusion that the defendants were utterly and callously indifferent to Moreland's rights, engaged in wanton physical violence, disregard of obvious medical needs, and subsequent deceit.

The ratio between the compensatory and punitive damages in this case does not test the limits of constitutionality, although we acknowledge that both the compensatory and

punitive damages awards are very large. There is no set
formula for determining when the line is crossed, although
the Supreme Court in *Campbell* suggested that "single-digit
multipliers are more likely to comport with due process."
*Campbell*, 538 U.S. at 425. In a recent case, this court
upheld a punitive damages award of more than 37 times the
size of the underlying compensatory damages in a case
involving only minor, albeit highly troublesome, physical
injury (bedbug bites). *See Mathias v. Accor Economy
Lodging, Inc.*, 347 F.3d 672, 676-78 (7th Cir. 2003).

The court emphasized in *Mathias* that "the judicial func-
tion is to police a range, not a point," and we cannot say that
the punitive damages in this case are beyond the range of
what is acceptable. The awards are roughly half the amount
of the compensatory damages. The defendants have not iden-
tified a single appellate case questioning the constitutional-
ity of a punitive damages award that is a fraction of the
underlying compensatory damages award. Nor have we.

On the third *Gore* guidepost the defendants cite several
excessive force cases decided by this and other courts, point-
ing out that the amount of the punitive damages in those
cases was much smaller than the awards here. But the cases
cited by the defendants are either quite dated or factually
distinguishable. *Cf. Bell v. Milwaukee*, 746 F.2d 1205, 1266-
67 (7th Cir. 1984) (upholding punitive damages of $25,000,
$150,000, and $350,000 for police officers' participation in
conspiracy to conceal facts of a fatal shooting); *Freeman v.
Franzen*, 695 F.2d 485, 490 (7th Cir. 1982) (upholding $1,000
award against correctional officer for twice hitting the face
of a restrained prisoner); *Hagge v. Bauer*, 827 F.2d 101, 110
(7th Cir. 1987) (upholding $25,000 award to an arrestee
whose leg was broken as a result of officer's kick); *Bogan v.
Stroud*, 958 F.2d 180, 186 (7th Cir. 1992) (upholding awards
of $5,000 and $1,000 against correctional officers who hit and
stabbed an inmate during altercation provoked in part by in-
mate slashing officer's face); *Thomson v. Jones*, 619 F.Supp.

745, 755 (N.D. Ill. 1985) (upholding award of $10,000 against correctional officer for hitting a handcuffed prisoner and causing hearing loss, and award of $5,000 against officer for acquiescence in co-worker's use of force); *Brown v. Triche*, 660 F.Supp. 281, 287 (N.D. Ill. 1987) (upholding award of $15,000 against deputy sheriff for beating of inmate that caused momentary unconsciousness, continuing pain "for some time," and humiliation). In light of the degree of reprehensibility of the defendants' conduct and the nature of the injuries inflicted, we conclude that the punitive damages awards against Dieter and Sawdon are not unconstitutional.

## D. Cross-appeal of summary judgment in favor of Sheriff Speybroeck

The plaintiffs cross-appeal the grant of summary judgment to Sheriff Speybroeck; they contend that they presented sufficient evidence to create a jury question as to Speybroek's § 1983 liability. We review *de novo* the grant of summary judgment, construing the record and all reasonable inferences drawn from it in the light most favorable to the non-moving party, in this case the plaintiffs. *Del Raso v. United States*, 244 F.3d 567 (7th Cir. 2001). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 450 (7th Cir. 1998).

Because Moreland was a pretrial detainee in the jail at the time of his death in custody, the plaintiffs' claim falls within the Fourteenth Amendment; however, we have previously noted that in this context a Fourteenth Amendment claim is evaluated by the same legal standards as an Eighth Amendment claim. *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002) (citing *Henderson v. Sheahan*, 196 F.3d 839, 844 n.2 (7th Cir. 1999)). The plaintiffs must demonstrate that the sheriff was deliberately indifferent to Moreland's safety,

that is, that the sheriff "was aware of a substantial risk of serious injury [to Moreland] but nevertheless failed to take appropriate steps to protect him from a known danger." *Id.* This requires the plaintiffs to show that "deliberate action attributable to [the sheriff] directly caused the deprivation of [Morelend's] civil rights." *Id.* (quoting *Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir. 2000)). Stated differently, the plaintiffs must demonstrate that the sheriff made a deliberate choice and that the injury was caused by the policy chosen. *Id.* That a different or better policy might have been used "does not necessarily mean that the [Sheriff] was being deliberately indifferent." *Id.*

Unconstitutional policies for purposes of § 1983 liability fall into three categories: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Butera*, 285 F.3d at 605 (citing *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1013 (7th Cir. 2000)). The plaintiffs' complaint alleged that unconstitutional policies of the sheriff were partly to blame for Moreland's death, but in response to the sheriff's motion for summary judgment that claim seems to have been dropped. The plaintiffs do not now argue that the sheriff instituted policies that were reasonably certain to result in Moreland's death; indeed, their expert testified that the jail policies in force at the time were adequate. Their claim is rather that the sheriff's deputies in the jail routinely violated the department's policies, and that the sheriff was deliberately indifferent to this widespread pattern of violations.

In their opening brief to this court, the plaintiffs failed to discuss the facts relevant to their claim against the sheriff, relying instead almost entirely on a series of string citations

to affidavits and other documents in the record. We will not scour a record to locate evidence supporting a party's legal argument. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 547 n.10 (7th Cir. 2002). Perfunctory or undeveloped arguments are waived. *Colburn v. Trustees of Ind. Univ.*, 973 F.2d 581, 593 (7th Cir. 1992); *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417 (7th Cir. 1986). In their reply brief the plaintiffs have tried to flesh out their argument with a more detailed discussion of the evidence. Even if the initial underdeveloped argument is not construed as a waiver, the evidence is insufficient to raise a jury question on the plaintiffs' claim against the sheriff.

The plaintiffs assert ongoing violations of jail policies in three areas: (1) use of the OC-10 spray; (2) a federal order requiring the sheriff to abate overcrowding in the jail; and (3) provision of medical care to injured inmates. As to the first of these, the plaintiffs point to tabulations of reported incidents of OC-10 spray use in the jail during the years 1995 (128 incidents), 1996 (73 incidents), and 1997 (17 incidents). They argue that this evidence demonstrates that the sheriff was aware of a pattern of violations of jail policy on the use of OC-10. But the number of pepper spray incidents, without more, does not establish that pepper spray was being routinely misused or that the jail's OC-10 policy was being violated.

The plaintiffs also contend that a memo sent to jail personnel in 1997 regarding the filing of incident reports constitutes an admission that OC-10 reports were not being filed, in violation of department policy. This is quite a stretch. The memo specifies when officers must file incident reports as a general matter. The jail policy on pepper spray instructs personnel to file an incident report "when chemical agents are used," and the memo clarifies that officers must file incident reports (presumably including OC-10 incident reports) before they go off duty from the shift during which the incident occurred. This does not constitute an admission

that jail personnel were not filing OC-10 reports at all or that pepper spray was being misused. Furthermore, the memo was from the jail warden, Major William Goss, not Sheriff Speybroeck. At any rate, we fail to see how the report-filing policy or practice was likely to lead to Moreland's death.

The plaintiffs also claim that there were six specific incidents of improper use of OC-10 at the jail, but the record evidence at the time of summary judgment points to only three. Incident reports indicate that inmate Daniel Grimm was sprayed after kicking the door of the drunk tank, then brought to the fourth floor for a shower, then placed in a restraint chair. While restrained, he spat on an officer and was charged with felony battery with bodily waste. Grimm sustained no injuries requiring medical care. In another incident, inmate Robert Coaron freed his legs from the shackles of a restraint chair and started kicking officers and spitting in all directions. The officers warned him that he would be sprayed if he did not desist; when he continued to spit at them, Dieter sprayed him. Coaron sustained no injuries requiring medical attention. In a third incident, inmate Casimer Wawrzyniak was in the drunk tank making loud noises and kicking the door. Officers opened the door intending to remove him to another floor, Wawrzyniak rushed the door and one of the officers sprayed him. He, too, sustained no injuries requiring medical attention.

There is nothing in the summary judgment record to suggest that these incidents involved a violation of the jail's policy on OC-10 use in the jail.[2] Equally important, these

---

[2] The plaintiffs have requested that we supplement the record with Daniel Grimm's trial testimony. This testimony was not in the summary judgment record before the district court; therefore, we will not consider it. *Hildebrandt v. Illinois Dep't of Nat. Res.*, 347 F.3d 1014, 1024-25 (7th Cir. 2003).

incidents do not amount to "a widespread practice" that is "permanent and well settled" so as to constitute an unconstitutional custom or policy about which the sheriff was deliberately indifferent. In any event, to be liable, Sheriff Speybroeck must have known there was a substantial risk of serious harm to Moreland; the primary injury here is Moreland's death, not the pain he suffered when sprayed with OC-10.

The plaintiffs also argue that Sheriff Speybroeck's deliberate indifference to Moreland's safety is demonstrated by his knowing violation of a federal consent decree requiring him to attempt to keep the inmate population at the jail at or below 300, or 350 on weekends. The jail housed 360 inmates on the day of Moreland's death, a Friday. The plaintiffs have not linked jail overcrowding to Moreland's death.

Finally, the plaintiffs argue that jail personnel were inadequately trained to recognize the signs of serious head injury and otherwise respond to a medical emergency. But they have not brought forward any evidence of inadequate training with respect to inmates' medical care. The plaintiffs' expert, Dr. George Kirkham, concluded that "there was a lack of training regarding the appropriate steps to be taken in a medical emergency," but he based this conclusion on the fact that Moreland himself was not treated adequately. There is no evidence that the policies, customs, or practices of the department were deficient. One cannot infer a custom or practice from a single incident.

The plaintiffs cite *Woodward v. Correctional Medical Services of Illinois*, 368 F.3d 917, 929 (7th Cir. 2004) for the proposition that a single violation of federal rights can trigger § 1983 under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978) if the violation was a "highly predictable consequence" of the failure to act. But *Woodward* does not relieve the plaintiff from the requirement of show-

ing that an unconstitutional policy, custom, or practice existed at the time the plaintiff's rights were violated; it says only that the plaintiff need not show that the policy, practice, or custom resulted in past deprivations of rights. *Woodward*, 368 F.3d at 929.

### III.  Conclusion

We conclude that the district court did not abuse its discretion under Rule 403 by admitting the videotaped interviews of the defendants and excluding evidence that the defendants were acquitted of criminal charges; also, the court's limiting instruction regarding this evidence was not inappropriate in any way. The defendants' *Daubert* challenge to Dr. Lustgarten's testimony was forfeited. The punitive damages awards against Dieter and Sawdon are not unconstitutionally excessive. We also conclude that summary judgment dismissing the plaintiffs' claim against Sheriff Speybroeck was appropriate. We affirm the judgment against Dieter and Sawdon and the summary judgment in favor of Speybroeck.

AFFIRMED

A true Copy:

Teste:

_____
***Clerk of the United States Court of***
***Appeals for the Seventh Circuit***